## H. B. WILLIS *vs.* STANDARD OIL CO.

Argued June 2, 1892. Decided June 27, 1892.

**Illuminating Oils Inspection Act Laws 1889, ch. 246, Construed.**

By Laws 1889, ch. 246, § 4, providing for the inspection of illuminating oils in tank railroad cars, the legislature intended the inspection to be made in such tank cars, without reference to the will of the owner.

**Inspection Wherever the Oil is Taken.**

If the owner remove the oil from such tank cars without inspection, the inspector may follow and inspect it in the place to which it is taken, and charge the same fees as for inspecting in the tank car.

**What Oils are Subject to Inspection.**

Such oils, when subject to the inspection laws of this state, and held and designed for sale in this state, may be inspected, though not yet put upon the market for sale.

**Validity of § 4 of the Act.**

That section is not in violation of article 4, § 27, of the state constitution.

**Act is a Police Regulation.**

On its face the act is a *bona fide* police regulation, a proper inspection law, and not a law levying a tax. What is a reasonable fee for inspection under such laws must depend largely upon the sound discretion of the legislature, having reference to all the circumstances and necessities of the case; and, unless it is manifestly unreasonable in view of the purpose of the law as a police regulation, the court will not adjudge it a tax.

**Fee not Unreasonable.**

There is nothing in the law from which we can say the fee is unreasonable.

**Inspector not Proper Party Plaintiff.**

A salaried officer, whose duty it is to collect fees pertaining to his office, and pay them into the state treasury, is not the proper party plaintiff in an action to collect such fees.

Appeal by defendant, the Standard Oil Company, from a judgment of the District Court of Ramsey County, *Otis*, J., entered against it March 18, 1892, for $3,151.68 fees for inspection of oils.

The plaintiff, H. B. Willis, was the State Inspector of illuminating oils. Between July 8 and September 30, 1891, he inspected, without consent or request of defendant, 15,260 barrels of its oil manufactured without the state from petroleum and designed for sale within the state; a part in tank railroad cars and a part after it had been drawn into storage tanks. The District Court gave him judgment for said amount, as his fees for his services in making the inspection. Laws 1889, ch. 246, provides that the inspector shall receive a salary of $2,400 per annum; that he shall collect the fees for inspecting oils and pay them over to the state treasurer; that he may inspect and test illuminating oils in tank railroad cars on the track, and it shall not be transferred into storage tanks or unloaded, until so inspected. The fees are prescribed by 1878 G. S. ch. 6, § 117, and are forty cents for testing and marking a single barrel, cask or package, thirty cents each when not exceeding five in number, twenty-five cents each when not exceeding ten in number, and twenty cents each when in number or packages greater than ten, submitted at one time for inspection.

*Hahn & Hawley; Stringer & Seymour; John D. O'Brien* and *James G. Flanders,* for appellant.

It is only oils that are offered for sale that must be inspected. It is the selling or offering for sale of uninspected oil that is prohibited. A dealer may keep any quantity of oil that he pleases, intend some time to sell it, but until the time arrives when he is about to offer it for sale, he need not have it inspected. The words barrel, cask, or package are broad enough to include a stationary storage tank. *State* v. *Finch,* 37 Minn. 433; *State* v. *Baggott,* 96 Mo. 63. But one inspection is necessary to test the oil in a single tank car or storage tank, and if the fees are held to be twenty cents per barrel, the whole fee may be $40 or more for a single inspection. Can this be held to be a reasonable inspection fee in view of the amount of labor required to make it? *In re Rebman,* 41 Fed. Rep. 867; 138 U. S. 78.

The act in question is a tax, and not a police regulation. *City of St. Paul* v. *Traeger,* 25 Minn. 248; *Mayor, etc.,* v. *Second Ave. R. Co.,* 32 N. Y. 261; *Mugler* v. *Kansas,* 123 U. S. 623; *Welton* v. *Missouri,*

91 U. S. 275; *Cook* v. *Pennsylvania,* 97 U. S. 566; *Clark* v. *Board of Health,* 30 La. Ann. 1351; *Lake View* v. *Rose Hill Cemetery Co.,* 70 Ill. 191.

The act in question is a violation of the Constitution of the United States, Art. 1, § 8, which provides that the Congress shall have power to regulate commerce with foreign nations, and among the several states and with the Indian tribes. *Walling* v. *Michigan,* 116 U. S. 446; *Case of the State Freight Tax,* 15 Wall. 232; *Machine Company* v. *Gage,* 100 U. S. 676; *County of Mobile* v. *Kimball,* 102 U. S. 691; *Wabash Ry. Co.* v. *Illinois,* 118 U. S. 557.

The State of Minnesota is the real party in interest. The fees for inspection go into the state treasury. The oil inspector is paid a salary which is in no wise dependent upon the fees collected. He is not the real party in interest. He has no more interest in the collection of these fees than has the county treasurer in the collection of taxes.

*Moses E. Clapp,* Atty. General, *H. W. Childs* and *Lusk, Bunn & Hadley,* for respondent.

The argument of appellant's counsel is largely based on the proposition that a tank or reservoir for permanently storing oil, a part of the real estate, which is not and cannot be moved, handled or transported, whatever its size, is a barrel, cask, or other package, within the meaning of the law; and that the oil inspector is bound to inspect it and place his brand upon it, for forty cents. The statement of the proposition is its own best refutation. These great tanks were unknown to the Legislature of 1876, and not within its contemplation.

The fees for inspection are not taxes. The act on its face purports to. be a police regulation. The fees, although partly paid to the state, are designed *prima facie* not to raise revenue, but to meet the cost of enforcing the inspection. He who alleges that the fees will raise, or were designed to raise, revenue for the State, must. show that clearly. The Court cannot know that these fees will yield a surplus of revenue after paying the cost of inspection. And what is more to the point, suppose a surplus revenue should result, what

has the court before it to show that, to have been the aim and purpose of the Legislature? *Powell* v. *Pennsylvania*, 127 U. S. 678; *Sinking Fund Cases*, 99 U. S. 700; *County of Livingston* v. *Darlington*, 101 U. S. 407; *Packet Company* v. *St. Louis*, 100 U. S. 423; *Morgan* v. *Louisiana*, 118 U. S. 455.

It is well settled that congress does not possess this police power, and that the states do. It is a power necessary to the existence of all government. It is the main object of government. *Prigg* v. *Pennsylvania*, 16 Pet. 539.

This is not a regulation of commerce. There is an infinite variety of police regulations, which affect interstate commerce, the enactment of which do not rest on any power in the state to regulate commerce, and which are perfectly valid in spite of their operation on commerce. Chief Justice Marshall fully explained this principle in *Gibbons* v. *Ogden*, 9 Wheat. 1.

The inspector is the party who is to collect the fees, and hence he is impliedly authorized, by virtue of his office, to enforce collection in his official name by suit. The general rule is that a public officer, although not expressly so authorized by statute, has implied authority to bring any suit which may be required for the proper discharge of his official duties. *Overseers of Pittstown* v. *Overseers of Plattsburgh*, 18 John. 407; *Todd* v. *Birdsall*, 1 Cow. 260, n.; *Supervisors of Galway* v. *Stimson*, 4 Hill, 136.

GILFILLAN, C. J. The principal questions in this case relate to the construction of Laws 1889, ch. 246, especially of section 4, and to its validity under the constitution. That chapter is one of a series of acts passed in different years having for their purpose to provide for the inspection of mineral illuminating oils, and the prevention of their sale for illuminating purposes, until inspected and ascertained to stand a test that would show them to be safe for use for purposes of illuminating. The first of these acts was passed in 1875, ch. 86. It prescribed a test, and required an inspection and a branding by the inspector on the package, cask, or barrel of the word "Approved," or the words "Rejected for illuminating purposes;" and prescribed a penalty for the sale to any person in this state of such oils for

illuminating purposes, whether manufactured, refined, or produced in this state or not, before such inspection. This act was repealed by Laws 1876, ch. 90, which made fuller provision than did the prior act for inspection, and for preventing sales for illuminating purposes without inspection and approval. Laws 1877, ch. 71, made some slight amendments to the act of 1876. Laws 1878, ch. 37, also amended in a few particulars the act of 1876. These several acts contemplated an inspection in the barrel, cask, or package, and at the manufactory or refinery where made or refined, or at the shop, store, or warehouse where kept for sale, except the act of 1878 provided for inspection in quantities less than fifty (50) barrels at any railroad or river station, and the fees for inspecting were at a specified rate per barrel, cask, or package. It seems, from statements made by both parties on the argument, that, after the last of these acts was passed, a new mode of putting up such oils for transportation, and of transporting and handling them, came into use, so that they were carried in large tanks, holding each as much as one hundred barrels, placed on railroad cars, from which the oils were removed to what are called "storage tanks," being stationary tanks, holding as much as 2,000 barrels each, where they were kept until taken out for sale, or they were taken from the railroad tanks into small tanks placed on wagon wheels, which were driven about, and the oils sold from them. The provisions of law providing for inspection in barrels, casks, or packages did not seem to include inspection in these railroad tanks, and this was probably one reason for passing the act of 1889. The first three sections contain provisions not in question here. Section 4 is as follows: "The inspector of illuminating oils and his deputies may inspect and test illuminating oils in a tank railroad car, so called, standing on a railroad track, and such oil shall not be transferred into warehouse or storage tanks, or unloaded, until so inspected. When such oil has been so tested and inspected no other inspection shall be necessary, but the inspector or deputy shall, when such oil is put into barrels, brand the said barrels without charge. When the amount contained in any such tank shall exceed fifty (50) gallons each, fifty (50) gallons shall constitute a barrel, within the meaning of the law, and the fees for in-

specting the same and for branding the barrel shall for each fifty
(50) gallons be the same as prescribed for each barrel or package,
by law."

The oil inspected in this case, the fees for inspecting which were
allowed by the court below, was inspected part of it in railroad tanks,
and the remainder in storage tanks to which it had been removed
from railroad tanks without having been inspected.   This raises the
point for construction of the section, the inspector claiming that he
is entitled to charge for inspecting in the storage tanks the oil so re-
moved before inspection from the railroad tanks the same fees as are
fixed by the section for inspection in the latter receptacles, to wit,
at the rate of so much per barrel of fifty gallons; while the defend-
ants claim that the section does not fix the rate of fees for the in-
spections made in the storage tanks, and that the fee is that fixed by
the general law, so much per barrel, cask, or package, and that for
the purpose the storage tank is to be taken to be a package.   It
would be a strange use of the term "package" to apply it to such a
receptacle into which the oil is put, not for the purpose of handling,
transportation, or sale, but only for keeping.   We might as soon ex-
pect to hear it applied to a grain elevator or a storage coal bin.   But
whether it may be called a package or not is not a practical ques-
tion; for it is beyond question that the legislature intended the in-
spection to be in the railroad tank, without reference to the will of
the owner.   The clause "such oil shall not be transferred into ware-
house or storage tanks, or unloaded, until so inspected," is as em-
phatic an expression of legislative intent that the oil is to be in-
spected in the railroad tank as though the law expressly attached a
penalty to such forbidden transferring or unloading; and the propo-
sition needs no argument to prove it, that the owner of the oil can-
not be permitted to gain anything by removal contrary to the prohi-
bition of the statute,—cannot either evade inspection, or the fees for
inspection, in the place where the act provides it shall be made.
Upon such unauthorized removal the inspector may follow the oil to
the place where it is taken, and there inspect it, and charge the same
fees for inspection as he would be entitled to for inspecting in the
railroad tank.

The point is made that the stipulation for submitting the case does not show the oils for inspecting which fees are claimed were illuminating oils. But the stipulation, after stating that Willis was inspector of illuminating oils, states that as such inspector he did inspect, test, and examine the quality of "such oils" to the amounts therein stated; no other but illuminating oils having been mentioned. The words "such oils" of course referred to oils such as had been previously mentioned, to wit, illuminating oils.

The further point is made that none but oils "offered for sale" can be inspected without the consent of the owner, and that the fact stipulated that these oils were "then and there on hand, and designed for sale in this state," does not bring them within the terms "offered for sale," used in Laws 1876, ch. 90, § 2, as amended in 1877. What do those words mean? Must there be an actual proffer of a sale to some particular person? Suppose the case of a merchant with a large stock of oils, which he keeps for sale, and which he intends to sell at any time, and to any and all persons, as he may have opportunity. Must the inspector wait till he offers each barrel or cask before he can inspect that barrel or cask? That would be a very narrow interpretation of the law, and would go far to render it inefficient as an inspection law. Further along in the same section the inspector is empowered, on request, to "enter during business hours into any store, shop, or warehouse in which illuminating oils are kept for sale, and inspect and test such oils." Section 4 requires such oils, manufactured, refined, or compounded within this state, to be inspected before being removed from the manufactory or refinery, even though they are not yet offered for sale. And section 8, as amended in 1878, empowers the inspector, without request, to enter during business hours any shop, store, yard, or warehouse, or other place in which he believes oils uninspected or unsafe for illuminating purposes are found, and inspect the same; and, as we have seen, section 4 authorizes an inspection in railroad tanks, without attaching the condition that the oils shall be offered for sale. The ultimate purpose of the law is to prevent the sale for illuminating of oils that would endanger the lives or property of the people of the state. Between the time when such oils come within the jurisdiction

of the state, so as to be the subject for the operation of a proper inspection law, and the time of sale to a consumer, there is no restriction as to the point of time at which the legislature may direct the inspection to be made. Nor do we think the legislature intended to limit the time at which oils held for sale in this state are to be inspected, except that the inspection must be before a sale for illuminating purposes. If held for sale in this state the oils may be inspected, though they have not been put upon the market for sale. The statement in the stipulation that the oils inspected "were then and there on hand, and designed for sale in this state," implies that they were designed for sale in their then condition, and does not admit the argument that they may have been intended for sale only after some process of refining or change of condition.

The defendants make to the act of 1889 the objection (nowadays made to almost every act of the legislature) that it violates article 4, § 27, of the state constitution, that "no law shall embrace more than one subject, which shall be expressed in its title." We see no ground for this objection. That the act, after providing for inspection in railroad tanks, has a provision, intended to enforce such inspection, prohibiting removal until inspection, is not the introduction of a new subject.

It is also objected that the act is one levying a tax, and not a police regulation. Of course, under the constitutional provision requiring taxes to be as nearly equal as may be, and to be levied on a cash valuation, the law could not be sustained as a tax law. It can only be upheld as an exercise of the police power of the state; as intended to be just what it purports to be,—an inspection law requiring to be inspected articles which, from their nature and use, may be dangerous to the lives or property of the people of the state. The imposition of fees for inspection, if intended as a mode of raising general revenue for the state, could not be sustained. It could be upheld only as a mode of making the business of dealing in oils pay the expense of its proper police regulation. That the state may make any business requiring police regulation pay the expense of regulating and controlling it, and that this may be done by exacting fees, license fees, or inspection fees, from those engaged in the

business, no one disputes. On its face this law is a *bonâ fide* po-lice regulation, a proper inspection law, and the fees are in good faith exacted to reimburse the state in the expense of inspection and enforcing observance of the law. Of course, the state or a munic-ipality may attempt to make the right to exact fees a cover for im-posing a tax for general revenue; and, when the court can say that such is the case, the law must stand or fall as a tax law. But a court would not arrive at that conclusion until compelled to do so. Good faith and honesty of purpose on the part of the legislature must be presumed. The reason urged why this is to be held a tax law is that the fees for inspection in large quantities, such as in railroad tanks, are unreasonable and excessive, and disproportioned to the amount of service required of the inspector. What is a reasonable fee for inspection must depend largely upon the sound discretion of the legislature, having reference to all the circumstances and neces-sities of the case, and unless it is manifestly unreasonable, in view of the purpose of the law as a police regulation, the court will not adjudge it a tax. *City of Mankato* v. *Fowler*, 32 Minn. 364, (20 N. W. Rep. 361;) *In re White*, 43 Minn. 250, (45 N. W. Rep. 232;) *City of Duluth* v. *Krupp*, 46 Minn. 435, (49 N. W. Rep. 235.) There is nothing in the case from which we can say the fees for inspection are unreasonable; nor in view of the provision that, after inspection in the tanks, the inspector, in case the oil is put into barrels, may be required to brand the barrels without further charge, can we say that the fees for inspection in the tanks are so disproportionate to the fees chargeable for inspection in barrels, casks, or packages as to suggest the idea that a tax was really intended.

The objection is also made that the law is in violation of the con-stitution of the United States, as an interference with interstate commerce. If it were applicable to the oil inspected while in transit through the state, and not intended for sale or use within it, the law, so far as thus applicable, would interfere with interstate com-merce. But we are to presume the legislature did not intend it to apply so as to interfere with the exclusive jurisdiction of congress; and, as the court below did not allow fees for inspecting the oil so in transit, it is unnecessary to consider the case of that oil. As to the

other oils, the stipulation does not show they belonged to interstate commerce. It must be conceded that, after articles imported into the state have been disposed of here to citizens of the state they are to be taken as intermingled with and as part of the general property of the state, so that the exclusive jurisdiction of congress over it has ceased. If we are to take judicial notice, as defendants ask us to do, that mineral oils come from other states, and that consequently those for inspecting which the fees were allowed at some time belonged to interstate commerce, there is nothing in the stipulation to show that they belonged to it at the time of the inspection. It is not stated that they were held by the importers, nor that they had not been disposed of by them to defendants, who are residents in, and presumably citizens of, the state. We are not inclined to determine so important a question as that presented by defendants until we are required to do so, and, as the facts do not call for a decision in this case, we decline to make any.

We have thought it proper to discuss all other questions made in the case, although, from the view we take of a question not yet referred to, we might have avoided doing so at present.

The defendants object that the inspector cannot maintain an action for the collection of the fees; that such action must be brought in the name of the real party in interest. The inspector is a salaried officer. The fees belong to the state. He is directed to collect them, to make monthly statements of the collections under oath, and pay them monthly into the state treasury. Mere authority to collect moneys belonging to another does not make the person authorized a trustee of an expressed trust, and the inspector is not "expressly authorized by statute" to bring suit. Cases decided under the rule at common law are cited to show that a public officer has implied authority to bring any suit which may be required for the proper discharge of his official duties. The question what officers might sue in their official character, and in what cases they might sue, seems to have been somewhat in doubt. The actual decisions do not go further than holding that, where public officers are clothed with a corporate or *quasi* corporate character, capacity to sue in that character will be implied; and probably, where the thing sued for

belongs to them in their corporate or *quasi* corporate capacity, they may now sue as the real party in interest. The inspector has no corporate or *quasi* corporate character, and, not being expressly authorized by statute to sue for the fees, he is not the proper party plaintiff.

For this reason the judgments must be reversed.

(Opinion published 52 N. W. Rep. 652.)