## STATE v. AHLGREN.

## STATE v. I. A. GRANT COMPANY.[1]

March 7, 1924.

Nos. 23,799, 23,800.

**Offer to sell less than the represented quantity.**

1.  An offer to sell, within the meaning of section 4616, G. S. 1913, penalizing an offer to sell less than the quantity represented, is accomplished by an attempt to sell, as a ton of coal, a quantity less than a ton.

**New trial on ground of newly discovered evidence denied.**

2.  Under the facts, there was no abuse of discretion in denying a motion for new trial on the ground of newly discovered evidence.

**Intent to defraud not necessary element of offense.**

3.  Under G. S. 1913, § 4616, penalizing an offer to sell less than the quantity of a commodity represented, intent to defraud is not a necessary element of the crime; deceit through carelessness being just as much prohibited as that due to clear intent.

I. A. Grant Company and John Ahlgren, its secretary, appealed to the district court for Dakota county from convictions in the municipal court of South St. Paul for offering for sale a certain quantity of coal, representing that it weighed 2,000 pounds when in fact it weighed less. The appeals were heard by Converse, J., who when the state rested denied defendants' motion to dismiss, and a jury which found defendants guilty as charged in the complaints. From orders denying their motions for a new trial and from the judgments entered pursuant to the verdicts, and from the sentence, defendants appealed. Affirmed.

*Bishop H.* and *Paul D. Schriber*, for appellants.

*Clifford L. Hilton*, Attorney General, and *Arthur E. Arnston*, for respondent.

[1]Reported in 197 N. W. 738.

STONE, J.

The two cases now to be disposed of come here on appeals by the I. A. Grant Company, a corporation, and John Ahlgren, its secretary, from convictions of unlawfully offering for sale two certain quantities of coal, representing the weight of each to be "one ton of 2,000 pounds," when in fact it was less. But one transaction is involved.

The Grant company is engaged in the retail coal business at South St. Paul. Mr. Ahlgren is its secretary. One Peterson has for a long time been in the company's employ as a driver of one of its coal wagons.

On the morning of November 28, 1922, Mr. Ahlgren started Peterson on his day's work with his "orders"—two sales tickets. One read in part as follows:

"Sold to A. Bielenberg   *   *   *
"One ton pea coal, $16.00."

The material part of the other was this:

"M. Kustratz   *   *   *
"One ton nut coal, $17.00 rear. Paid."

Peterson's wagon box was divided by a transverse removable partition into two compartments of approximately equal capacity.

Upon receiving the sales tickets, and without having his wagon weighed, Peterson loaded into the front compartment what he estimated to be a ton of pea coal for Bielenberg, and into the rear compartment what he estimated to be a ton of nut coal for Kustratz.

By reason of his long experience, Peterson claims to be able to guess very accurately (within 10 to 30 pounds per ton), the amount of hard coal he has in his wagon.

When thus loaded, the wagon was driven onto the scales of the Grant Company, and, with the driver, chute, shovel and load, weighed, according to Mr. Ahlgren's testimony, 6,390 pounds. The evidence does not show just when the wagon had been weighed before. It is claimed by defendants that its weight at this time (to-

gether, of course, with that of the driver, chute, partition and shovel), was 2,380 pounds. Anyway, that was the figure used for "tare" and resulted in Ahlgren's conclusion that the net weight of the coal, which was then being started on its way to the purchasers, was 4,010 pounds. That would indicate an average on the two tons of 10 pounds.

Except for their reliance upon Peterson's accurate guessing, defendants had no assurance as to the proper division of the 4,010 pounds between the two customers. That is, their only assurance that one customer was not getting less and another more than a ton was their confidence in Peterson's ability as an estimator of quantity.

The weighing over, Peterson started on his way to make the deliveries. He was headed for the Kustratz home when Mr. Barron, of the state department of weights and measures, and one of his inspectors, intercepted the load and ordered its return to the office. Prompt compliance was made and the load immediately driven back onto the scales. It was then weighed under Mr. Barron's supervision. The gross weight was then found to be 6,270 pounds. The wagon was then taken off the scales and the Kustratz coal unloaded from the rear compartment. The outfit was then weighed as before, and found to make 4,320 pounds—the result indicating that the Kustratz coal had weighed only 1,950 pounds, or 50 pounds short of a ton.

The wagon was again driven off the scales and Bielenberg's coal removed. The weight of the wagon, driver, chute and shovel was then found to be 2,460 pounds—the result indicating that the Bielenberg coal weighed only 1,860 pounds, or 140 pounds short of the supposed ton.

It will be observed that the total indicated shortage was 190 pounds.

During the weighing by Mr. Barron and his assistant, Mr. Ahlgren remained in the office adjoining the scales. He apparently paid little attention to what was going on. Afterwards he did not question the methods employed, nor the accuracy of the results. He did not ask to have any of the work done over again, either on

the same or different scales. Mr. Barron caused the scales to be tested independently and immediately by another inspector from his department. That was done by running an automobile onto the platform which put on what is called a "strain weight" of about 3,500 pounds. The scale beam was then balanced and an added weight of 1,000 pounds was applied, first on one extreme corner of the platform, and then on each of the others. The result showed the scales to be accurate within an allowed tolerance of 2 pounds for each 1,000 pounds of weight. They were "fast" not more than that.

Upon this state of the facts, the case was tried. The evidence for the state consisted of the testimony of Mr. Barron and his inspectors in connection with which the sales tickets, given to the driver by Mr. Ahlgren, were introduced. The purchasers, Bielenberg and Kustratz, testified that they had each ordered a ton of coal. The case for defendants consisted mainly of evidence of Mr. Peterson's ability to load hard coal very accurately by guess, and of Mr. Ahlgren's testimony of the gross weight of the load as Peterson started out with it, and the "tare" weight of the wagon—it not appearing very clearly, however, just when the latter had been weighed.

Mr. Ahlgren insisted that his weights were correct, and that the coal actually weighed ten pounds more than the 2 tons required to fill the two orders. He admitted having no assurance, other than his confidence in Peterson's guessing ability, that the load was evenly divided between the two customers. Both defendants were convicted.

On their appeals, the first point urged is that the trial court erred in charging the jury that "'offered to sell' as used in the statute under which this charge is brought, may be taken to mean substantially the same as attempted to sell, or undertook to sell, or tried to sell. It is for the purposes of this case synonymous with these explanations."

This charge was excepted to, as was also the refusal to instruct to the effect that the representation as to weight of the coal, in order to be material under the statute, must be "made to the intended purchaser or some person acting for him." The statute referred

to, upon which the prosecutions are predicated, is section 4616, G. S. 1913. It penalizes any person who "shall sell or offer or expose for sale less than the quantity he represents."

The learned trial judge filed a characteristically clear and complete memorandum supporting his denials of the motions for a new trial. He disposes of this ground of appeal, in a manner upon which the writer cannot improve, as follows:

"A brief examination shows that lexicographers do not give the word 'offer' or the phrase 'offer to sell' the limited or restricted meanings contended for by the defendant. Webster's New International Dictionary defines 'offer' to mean, among other things, 'to attempt'; 'undertake'; 'try'; and quotes from Shakespeare, 'all that offer to defend him'. The following is from the Century Dictionary:* * * 'To expose for sale'; * * * 'To propose, to give or to do; proffer; volunteer; show a disposition or declare a willingness to do'; * * * 'To attempt to do; set about doing (something) to or against one; attempt; make a show of doing (something)'. We also find that Courts have given a wider meaning to that phrase than contended for by defendant. * * *.

" 'Offer', as used in Pen. Code, Sec. 67, making it a felony for anyone to offer any bribe to any executive officer, means a proposition to do a thing, to bring to or before, to hold out, to proffer, to make a proposal to; and hence the crime of offering to bribe an executive officer is complete under the Code without any tender or production of the money offered. People v. Ah Fook, 62 Cal. 493, 494.

"Webster defines the word 'offer' as (1) a proposal to be accepted or rejected; (2) first advance; (3) the art of bidding a price or sum bid; (4) attempt, endeavor. 'Attempt' is defined to make an effort to effect some object; to make a trial or experiment; to direct; to endeavor, to use exertion for any purpose. Accordingly, the words 'offer' and 'attempt' are convertible terms. Consequently, an indictment for bribery which alleged that the accused did offer to do a certain act was sufficient, as the offer to bribe was an attempt to do so, within the meaning of the statute. Commonwealth vs. Harris

(Pa.) 1 Leg. Gax. R. 455, 457. * * * 'offered for sale' in Laws 1876, C. 90, Sec. 2, as amended in 1877, providing for the inspection of illuminating oils offered for sale, means held for sale, though they had not been put on the market for sale. It does not require an actual proffer for sale to some particular person. Willis v. Standard Oil Co. 52 N. W. 652, 653, 50 Minn. 290."

Against this position, so well fortified below, counsel for appellant argues very insistently that there can be no offer to sell without a communication of it to an offeree; that the offer is not complete—is not an offer at all—until it is communicated. That argument would hold very nicely if we were considering the question of contract law whether, as between defendants and their customers, there was a completed contract by an acceptance of the offer. That is not at all the question before us. It is the very different one as to the meaning of the phrase "offer to sell" as used in the statute. As to that, we adopt without hesitation the views of the learned trial judge. To us they seem obviously correct.

It should not be forgotten that the customers, Bielenberg and Kustratz, each testified to having ordered from the Grant Company a ton of hard coal.

That such orders were in the process of actual delivery, and that the attempt was being made to fill each with a quantity of coal less than the amount ordered, in fraud, intentional or otherwise, of the purchasers, was a conclusion very properly drawn from the evidence. To set aside the resulting convictions upon the ground that there was no offer to sell would be doing violence to the plain intent of a salutary statute.

The other problem for our consideration is as to whether a new trial should have been granted because of newly discovered evidence.

The Grant Company's scales, as already indicated, stood very well the test of November 28, 1922. They continued in use by defendants until the trial in June, 1923. No trouble developed. At least, none had been discovered.

Just before the trial, Peterson's wagon was weighed on the Grant scales and two others, one in South St. Paul and one in Hastings. It

weighed the same on each. That fact was proved at the trial by defendants. It was rather cogent evidence that the Grant scales then were not far wrong.

On July 24, 1923, some four weeks after the trial, something seemed to go wrong rather suddenly. The scales would not weigh with any approach to accuracy. A state inspector was called. He could make no diagnosis and ordered the scales sealed against further use.

The manufacturers were then called upon. Their representative discovered that the bearings (consisting of knife edges engaging with grooved plates), through which the weight on the platform was communicated to the supporting levers underneath, and thereby to and indicated on the scale beam, were so corroded by rust, that even approximate accuracy of the mechanical, lever multiplication of weight was impossible. The knife edge bearings were not the only ones that had to be replaced. There were pivot bearings consisting of a fairly sharp pivot engaging with and centered in a cup, that also had to be replaced.

The scales were in the open. They had been there 7 or 8 years. Water, snow and ice accumulated from time to time in the pit beneath the platform. The corrosion, so fatal to the closely adjusted lever mechanism, resulted from the rust consequent upon these conditions. There had been no inspection of the mechanism under the platform from the time of the installation of the scales until July 24, 1923, when the result was as indicated.

An affidavit of a competent scale expert, submitted in support of a new trial, states with confidence the conclusion that the condition referred to would prevent accuracy to the extent of 100 pounds to a ton and that in his judgment it must have existed for fully 18 months prior to July 24, 1923. That is, if his conclusion is correct, the scales on November 28, 1922, when the events under consideration occurred, were probably inaccurate to the extent indicated.

The proffered evidence is not cumulative, a fact frankly recognized below. It is material as tending to show that the scales were not to be relied upon for any purpose on November 28, 1922. A new

trial was denied upon the ground that due diligence had not been shown in its procurement. We hold that conclusion to be well within the discretion of the trial court.

The experience of November 28, 1922, should have demonstrated to defendants that something was wrong somewhere. The scales and the man using them could not both have been right. They did not suspect the scales. They continued using them in their then condition for another 7 months. No complaint resulted. It seems certain that, if the scales were wrong to the extent of 100 pounds to the ton, as good an estimator of weights as Mr. Peterson would have discovered the existence, if not the extent, of the difficulty. It is impossible to consider that scales so far wrong could have remained in constant use so long in honest and competent hands.

It is rather an obvious precaution, when the accuracy of platform scales so long and directly exposed to the elements is challenged, to see if everything is right under the platform. Therefore, we are not impressed with the argument that due diligence was exercised with respect to the new evidence. At least, we are not sufficiently impressed to reverse the result of the careful consideration given to the case below.

Before this trouble, defendants had been warned by the department of weights and measures of possible complications from their practice of trusting their driver to guess what their customers were entitled to.

Moreover, the Grant Company has a record of two prior convictions of similar offenses. This circumstance made it impossible for the court below to accept at their face value all of the affidavits in support of the motion for a new trial.

It may be that defendants are innocent of any intent to defraud their customers through short weights. Even at that, they have no cause for complaint. They were so grossly careless of the rights of the public, and so indifferent to their duty to see to it that their customers were given the full weights paid for, as to have become obvious violators of the statute and amenable to its penalties.

Under the statute, intent to defraud is not a necessary element of the crime. Deceit through carelessness is just as much prohibited

as that due to clear intent. Scales must be kept honest. There may be cases where a merchant is not responsible for the shortcomings of his weighing devices, but this is not one of them.

Judgments affirmed.