554 F.2d 1094
 180 U.S.App.D.C. 235, 2 Media L. Rep. 1142
 NATIONAL CABLE TELEVISION ASSOCIATION, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
LAMB COMMUNICATIONS, INC., Liberty Communications, Inc. and
Summit Communications, Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
 Nos. 75-1053 and 75-1132.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 22, 1976.
Decided Dec. 16, 1976.
 
 Charles S. Walsh, Washington, D.C., with whom Stuart F. Feldstein, John V. Kenny and Samuel Cooper, III, Washington, D.C., were on the brief for petitioner in No. 75-1053, also argued for petitioners in No. 75-1132.
 Jack David Smith, Counsel, F.C.C., Washington, D.C., with whom Ashton R. Hardy, Gen. Counsel, Daniel M. Armstrong, Acting Associate Gen. Counsel, C. Grey Pash, Jr., Counsel, F.C.C., Robert B. Nicholson and Laurence K. Gustafson, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents. Joseph A. Marino, Associate Gen. Counsel, F.C.C., Washington, D.C., at the time the record was filed, and Howard E. Shapiro, Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 Herbert M. Schulkind, James K. Edmundson, Benito Gaguine and Arthur G. House, Washington, D.C., entered appearances for petitioner in No. 75-1132.
 Before MacKINNON and ROBB, Circuit Judges, and BRODERICK,* United States District Judge for the Eastern District of Pennsylvania.
 Opinion for the court filed by MacKINNON, Circuit Judge.
 MacKINNON, Circuit Judge:
 
 
 1
 Petitioners, an association of cable television operators and two individual operators, seek review of two orders of the Federal Communications Commission (FCC) which (1) promulgate a schedule of annual fees to be collected from all cable television operators,[1] and (2) determine that these fees, with certain modifications, be collected retroactively to March 29, 1974, when collections under a previous fee schedule were suspended.[2] Because we find that the annual fees assessed by the first order do not meet tests established by the Supreme Court under the relevant statute, and thus that the first order is invalid, we do not reach the challenge to the second order.
 
 I.
 
 2
 The statutory authority and direction for the FCC to assess fees against members of the industries it regulates is the Independent Offices Appropriation Act of 1952 (IOAA).[3] That Act provides:
 
 
 3
 It is the sense of the Congress that any work, service, publication, report, document, benefit, privilege, authority, use, franchise, license, permit, certificate, registration, or similar thing of value or utility performed, furnished, provided, granted, prepared, or issued by any Federal agency (including wholly owned Government corporations as defined in the Government Corporation Control Act of 1945) to or for any person (including groups, associations, organizations, partnerships, corporations, or businesses), except those engaged in the transaction of official business of the Government, shall be self-sustaining to the full extent possible, and the head of each Federal agency is authorized by regulation (which, in the case of agencies in the executive branch, shall be as uniform as practicable and subject to such policies as the President may prescribe) to prescribe therefor such fee, charge, or price, if any, as he shall determine, in case none exists, or redetermine, in case of an existing one, to be fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts, and any amount so determined or redetermined shall be collected and paid into the Treasury as miscellaneous receipts. . . .
 
 
 4
 31 U.S.C. § 483a (1970). The FCC first established fee schedules pursuant to this statute in 1963,[4] initially making only nominal charges for filings with the agency that produced revenue equivalent to approximately 25 percent of the Commission's annual appropriation.[5] No fees were assessed against the cable television industry by the 1963 fee schedule. In 1970, responding to pressure by various authorities[6] to adopt higher fees which would make the agency more self-sustaining, the FCC amended its fee schedules and for the first time imposed filing fees and an annual fee of 30 cents per subscriber upon cable television operators.[7]
 
 
 5
 The annual fees assessed against members of the cable television industry were struck down by the Supreme Court on March 4, 1974, in National Cable Television Assn. v. United States (NCTA), 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974). That case and a companion case, FPC v. New England Power Co., 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974), established standards which must be met by fees adopted by agencies under the IOAA. In NCTA, the Court found that the FCC assessment of 30 cents per subscriber was calculated to reimburse the total cost (direct and indirect) to the Commission of regulating the cable television industry, regardless of whether or not each individual operator had received any "special benefit" from that regulation. Holding in effect that it was the intent of the IOAA to require fees to be based on "value to the recipient" and not upon "public policy or interest served (or) other pertinent facts," 415 U.S. at 341, 342-343, 94 S.Ct. at 1150, the Court found that the FCC's failure to use this measure made the 30 cent assessment a tax, which the agency had no power to levy.
 
 
 6
 In the New England Power case, decided the same day as NCTA, the Court further declared that the "special benefit" concept requires some nexus between the agency and the person assessed other than the mere fact of regulation or the adoption of some practice of general benefit to the industry as a whole. Quoting with approval a Bureau of the Budget circular which interprets the IOAA,[8] the Court held that "no charge should be made for services rendered, 'when the identification of the ultimate beneficiary is obscure and the service can be primarily considered as benefitting broadly the general public.' " 415 U.S. at 350, 94 S.Ct. at 1154. These cases constitute the only Supreme Court interpretations of the IOAA, and taken together with the statute they set the standard against which we must measure the current FCC fees.
 
 
 7
 After the 1970 fee schedule had been invalidated by the Court, the FCC suspended collection of the annual fee for cable television systems,[9] stating that the appropriate annual fees for calendar year 1973 would be published after further proceedings.[10] On January 15, 1975, after the public had been afforded an opportunity to comment,[11] the Commission adopted the 1975 fee schedule.
 
 
 8
 The annual authorization fee found in the 1975 schedule, which is the fee at issue in this action,[12] is assessed in basically the same manner as was the 1970 annual fee.[13] Both fees were designed to recover the costs of cable regulation by dividing them up among the regulated operators. The difference between the two fees lies in the determination of what costs it was permissible to recover in this manner. In 1970, the Commission attempted to set rates for the services of its six basic bureaus[14] which would recover the agency's entire annual appropriation, including the costs of "general support" activities which were not related to any service or benefit rendered to the parties who were assessed the fees.[15]
 
 
 9
 In 1975, on the other hand, the fee set for each of the basic bureaus was "devised to recover basically the costs associated with the processing of applications and tariff filings."[16] In order to do this, the Commission first calculated a figure representing the "total projected costs" of each bureau, composed of "all costs which can be attributed to the (particular bureau) including costs allocated from the administrative law judges, the Review Board, the Office of Opinions and Review, the Data Automation Division, and the Dockets Branch"[17] plus a pro rata share of certain indirect costs of the Executive Director's office.[18] Once the "total projected costs" figure had been thus calculated, it was multiplied by the "percentage of each activity that was devoted to application processing" to determine the cost of processing applications.[19] The record does not adequately explain how this percentage of 44.6% was determined. Finally, a portion of the cost of the Antenna Survey Program conducted by the Field Operations Bureau was added in to arrive at a "fee recoverable cost" for the particular bureau, and a fee was then set which would bring in revenue equal to that final figure. The actual rate at which the fee would be assessed was determined by scaling down the rates used in the 1970 fee schedule until it was estimated that revenue equal to the newly calculated "fee recoverable cost" for 1975 would be raised.[20] The resulting 1975 fee schedule assesses, inter alia, an annual authorization fee at a rate of 13 cents per subscriber, due on April 1, 1976.
 
 
 10
 Having adopted the 1975 fee schedule, the Commission shortly thereafter acted to collect fees for the period March 29, 1974, through the effective date of the new schedule, March 1, 1975.[21] Those fees, collection of which had been suspended shortly after the decision of the Supreme Court in NCTA,[22] were to be recalculated on the basis of a modified 1975 Fee Schedule.[23] As a result, cable television operators were assessed an annual authorization fee of 6 cents per subscriber for fiscal years 1973 and 1974. These fees were due on August 1, 1975.
 
 
 11
 On July 28, 1975, this court issued a partial stay pending appeal, "so that the Federal Communications Commission may collect fifty percent, but no more, of the fees which are due on August 1, 1975, and on April 1, 1976, until further order of this Court." In response to that order, and to lessen administrative burdens, the Commission suspended all cable annual fee collections until completion of judicial review.[24]
 
 II.
 
 12
 The criticisms made by petitioners of the 1975 fee schedule can be divided into three categories: first, it is alleged that there is no proper justification under the statute for an annual cable television authorization fee; second, petitioners contend that the cost basis for the fee was improperly calculated; and third, they argue that the rate at which the fee itself is assessed is so high as to be confiscatory. We shall deal with these issues in that order. In doing so we are required to follow the Supreme Court opinions in NCTA and New England Power, which "greatly narrow(s) the act." 415 U.S. at 351, 94 S.Ct. 1151.
 
 
 13
 The IOAA clearly specifies that fees assessed under its authority must be justified by some "work, service, publication, report, document, benefit, privilege, authority, use, franchise, license, permit, certificate, registration, or similar thing of value or utility performed, furnished, provided, granted, prepared, or issued by any Federal agency. . . ." 31 U.S.C. § 483a (1970). We interpret this to mean that the FCC must identify the activity which justifies each particular fee it assesses. With regard to the particular fee at issue here,[25] the Commission appears to have addressed this concern in its Further Notice of Proposed Rulemaking:
 
 
 14
 Cable television systems clearly are identifiable recipients of services performed by the Commission related to the processing of applications either through the grant of individual certificate of compliance applications, or by the general authority under which all cable systems are permitted to operate pursuant to the Commission's rules until 1977 without an individual certificate of compliance.
 
 
 15
 48 F.C.C.2d at 417.[26] The annual authorization fee therefore appears to be a grant fee charged for the annual conferral upon cable operators of their authority to operate or for the permission for them to operate without written authority under a "grandfather clause." But the Commission has not explained which application processing activities are reimbursed by its filing fee and which by its grant fee, making it impossible for us to conclude that the two fees do not charge the cable operators twice for the cost of the same services. On that basis alone we could remand the case to the FCC.[27] It is essential that an agency make clear the basis for a fee it assesses under the IOAA, so that a reviewing court can determine whether or not the "value to the recipient" standard is met.
 
 
 16
 If on remand the agency identifies specific application processing activities which justify the fee, it will have satisfied this first requirement of the statute. We put no stock in the arguments of petitioners that the Commission does not in fact give them authority to operate because it is the state or local government that grants an operator his franchise.[28] The rules of the FCC clearly state that, with only minor exceptions,[29] "(n)o cable television system shall commence operations or add . . . to existing operations unless it receives a certificate of compliance from the Commission," 47 C.F.R. § 76.11(a) (1975) (emphasis added). Cable television systems in operation before the effective date of the rule (March 31, 1972) are given a limited "grandfather" right to continue in operation without a certificate of compliance until the end of their current franchise periods or March 31, 1977, whichever occurs first. 47 C.F.R. § 76.11(b) (1975).
 
 
 17
 The issuance of a certificate of compliance under 47 C.F.R. § 76.11(a) is a service rendered by the FCC to the cable operators, and the agency is fully justified in seeking reimbursement of any expenses incurred in performing that service. The costs assessed may include a pro-rata share of any expenses for regulatory activities which are necessary in order to grant such authority, but cannot include those expenses independently required to protect the public. See Electronic Industries Assn. v. FCC, --- U.S.App.D.C. ----, 554 F.2d 1109 (1976).
 
 
 18
 It is not so clear, however, that the limited "grandfather" rights conferred by the Commission on certain cable operators under 47 C.F.R. § 76.11(b)[30] are a sufficient justification for a fee. The grant of authority to continue in operation for a limited time without a certificate of compliance involves no immediately apparent direct service or direct expenditure of agency funds for which the cable operators may be assessed. Thus, it is unlikely that the FCC can justify charging these operators the same fee as those whose application resulted in the grant of a license. See text infra, --- U.S.App.D.C. at ----, 554 F.2d 1105-1108. This does not mean, however, that we find this portion of the 1975 fee schedule to be completely invalid; the determination of validity must be made by the Commission on remand, since it is entirely possible that there is a justification for this fee which does not appear in the record. For example, both Congressman Yates, see text infra, --- U.S.App.D.C. at ----, 554 F.2d at 1102, infra, and the Supreme Court of Florida in Finlayson v. Conner, 167 So.2d 569 (Fla.1964), see note 45 infra, speak of "protection" as a justification for a fee. If cable operators benefit from specific services or agency expenditures which protect their operations, the agency would be justified in charging them some fee. NCTA, 415 U.S. at 343, 94 S.Ct. 1146.
 
 
 19
 In arguing that there is no justification for an annual fee against any cable operator, petitioners attempt to make much of the fact that it was not necessary in the public interest for the Commission to assume this regulatory authority in the same way that it was of public necessity for it to allocate to broadcasters the limited frequencies of the electromagnetic spectrum or to recognize one telephone company as a substantial monopoly, and thus that the agency in truth renders no "service" or "benefit" to them. Unlike those other industries, it is argued, the cable television industry could have developed better without FCC regulation. Petitioners' Brief at 24. All that may be true, but these distinctions have no relevance here. The fact is that the FCC has undertaken to regulate this industry and has so far been sustained by the Supreme Court in this endeavor,[31] with the result that a certificate of compliance has become a necessary and therefore valuable license.[32]
 
 
 20
 In addition, it seems clear that a proper interpretation of the IOAA directs the FCC to charge a fair and equitable fee for the expenses it incurs in granting cable television operators authority to operate. The Supreme Court said as much in NCTA:
 
 
 21
 A fee . . . is incident to a voluntary act, e. g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society.
 
 
 22
 415 U.S. at 340-41, 94 S.Ct. at 1149. This interpretation is also supported by the legislative history, which indicates that Congress contemplated that agencies would assess fees for their grants of operating authority:
 
 
 23
 . . . I think it is only fair that in exchange for the franchise that the Government gives the broadcasting company and the protection which the Government affords to such broadcasting company to assure its freedom from interference in the operation of its broadcasting facilities in the particular point of the spectrum which it occupies, that it should pay some of the costs of the hearings. It is perfectly proper that the franchised company make a profit, and there has been much profit making. Such companies should assume a greater share of the costs, because regulation is necessary.
 
 
 24
 97 Cong.Rec. 4809 (1951) (statement of Cong. Yates).[33] Nor does the holding of New England Power require a different conclusion. The Supreme Court did say in that decision that
 
 
 25
 (s)ome of the assessments made by the Commission under its formula would be on companies which had no proceedings before the Commission during the year in question. The 'identifiable recipient' of a unit of service from which 'he derives a special benefit,' to quote the Office of Management and Budget, does not describe members of an industry which have neither asked for nor received the Commission's services during the year in question.
 
 
 26
 415 U.S. at 351, 94 S.Ct. at 1155. However, we reject the argument that this statement requires actual contact with the agency during the year in question by each cable station assessed as a prerequisite to charging those persons a fee. The Court in New England Power was dealing with a factual situation in which there was no demonstrated specific service to the individual power and gas companies; rather, the FPC was attempting to assess the costs of administering its programs against the industry as a whole. Indeed, the Court in that case went on to observe:
 
 
 27
 A blanket ruling by the Commission, say on accounting practices, may not be the result of an application. But each member of the industry which is required to adopt the new accounting system is an "identifiable recipient" of the service and could be charged a fee, if the new system was indeed beneficial to the members of the industry. There may well be other variations of a like nature which would warrant the fixing of a "fee" for services rendered.
 
 
 28
 Id. Thus the Court recognized that a fee may be permissible in certain situations despite a lack of contacts between the agency and the person assessed during the year in question. The fact that the application which initiates the service is not filed annually is no bar to an annual assessment, so long as there has been service rendered and expenses incurred that benefitted those charged during the year. Therefore the existence of a grant of operating authority by the FCC is a proper justification for a properly assessed annual fee. Again, the fact that the public interest is also benefitted by the regulation of entry into the industry does not mean that cable operators cannot be charged, so long as those operators are identifiable beneficiaries of agency services.
 
 
 29
 The second criticism made of the 1975 fee schedule is that the cost basis for the fee that is, the figure representing the total of the expenses which the particular fee is to reimburse was calculated in contravention of the guidelines established by the Supreme Court. As discussed above[34] the Supreme Court in NCTA required that a fee assessed under the authority of the IOAA be measured by "value to the recipient." The NCTA Court found that the 1970 FCC fee schedule did not set fees measured by this standard, and held that
 
 
 30
 (w)hile those who operate CATV's may receive special benefits, we cannot be sure that the Commission used the correct standard in setting the fee. It is not enough to figure the total cost (direct and indirect) to the commission for operating a CATV unit of supervision and then to contrive a formula that reimburses the Commission for that amount. Certainly, some of the costs inured to the benefit of the public . . ..
 
 
 31
 415 U.S. at 343, 94 S.Ct. at 1150 (emphasis added).
 
 
 32
 The FCC, in formulating its 1975 fee schedule, interpreted the above-quoted holding of the Supreme Court to command "that the cable television annual fee should not include the agency's costs 'for the protective services rendered the public by the Commission.' "[35] In accordance with this view, the Commission went on to propose
 
 
 33
 a revised schedule of fees whereby only those activities that are specifically identified as primarily benefitting identifiable recipients will be included as costs in the fee program. The costs of those activities which either cannot be identified as specifically benefitting identifiable recipients, or which can be identified as primarily benefitting the general public will not be recouped through collection of fees. The Commission does not consider that either (the IOAA) or the NCTA decision establishes mutually exclusive categories of services, i. e., the Commission is not limited to charging fees for services which solely benefit the recipients of those services. Such a view would render (the IOAA) a nullity because the very basis for the establishment of the Commission was the protection of the public interest in wire and radio communication, and public interest considerations are thus an inherent part of all Commission activities. It is our view that the Commission is authorized to charge fees for those services that provide a value to identifiable recipients, which we have identified as activities associated with processing of application that provide authorization for individuals, for example, to operate radio transmitters, or sell radio equipment, or collect common carrier charges. The fact that the general public may also benefit by Commission authorization of such activities, in that the activities may directly or indirectly provide a service to the public, does not limit the Commission's authority to charge a fee to the recipients of the services that will allow those services provided by the Commission to be operated on a self-sustaining basis as mandated in (the IOAA).
 
 
 34
 48 F.C.C.2d at 404.[36] Thus,
 
 
 35
 (t)he proposed fee schedule is devised to recover basically the cost associated with processing of applications and tariff filings. It is our view that this approach is consistent with the Court's interpretation of the statute, since the fees will recover only so much of the Commission's total costs as are attributable to work done to create value to the recipients. The costs of activities that are not directly related to the providing of specific services through application or tariff processing will not be recovered through the fee program.
 
 
 36
 Id.[37] Up to this point, there is nothing in the record that would permit us to disagree to any major extent with this general description of the cost basis for the Commission's fees. The statement that fees will be assessed only for "those activities that are specifically identified as . . . benefitting identifiable recipients" is fully consistent with the letter and the spirit of the NCTA decision,[38] and we find no fault with the idea that a fee may be charged for an activity so identified despite the fact that the general public secondarily benefits from it. See generally Electronic Industries Assn. v. FCC, --- U.S.App.D.C. ----, 554 F.2d 1109 (1976). Similarly, the direct costs associated with the processing of applications and tariff filings are clearly expenses for activities that benefit an identifiable recipient (the applicant or person filing). Id.
 
 
 37
 But the agency must be more explicit in stating the cost basis for its individual fees. In order for a reviewing court to determine that a fee has indeed been measured by "value to the recipient," the FCC must make a public statement of the specific expenses which are included in the cost basis for that fee. We have already found that it is permissible for the FCC to recover in fees the expenses it incurs in granting to cable systems the authority to operate; but it is equally clear that the existence of this limited power to charge fees does not authorize the agency to load upon cable operators expenses which are only tangentially related to grants of operating authority. New England Power held that there must be a sufficient nexus between the agency service for which the fee is charged and the individuals who are assessed, since the IOAA gives the agency no authority to charge for general activities which independently benefit the public at large, but allows "only specific charges for specific services to specific individuals or companies." 415 U.S. at 349, 94 S.Ct. at 1154. Thus, the FCC is required to show the particular costs which they are assessing against the recipients so as to assure them that they are paying only for the specific expenses which are incurred in connection with the service of granting them their operating authority.
 
 
 38
 This was not done here, and thus we cannot conclude from the record before us that the 1975 annual authorization fee has been formulated in a manner consistent with the requirements of the IOAA. Instead of listing the specific expenses which form the cost basis of the cable television fees, the FCC began with its total budget and eliminated whole offices or activities which it found to be "too far removed" from the direct regulatory function. Cable television operators were assessed the total cost of operating the Cable Television Bureau, plus a "pro rata" share of certain general support activities, all reduced by an unexplained percentage.[39] There was no explanation of what activities were performed by the Cable Bureau that amounted to 44.6 percent of its budget, nor how these activities related to the grant of operating authority to cable systems. There was no time cost study explanation of how the Cable Bureau's "pro rata share" of indirect costs was arrived at, nor any evidence that 44.6 percent of those indirect costs relate to the grant of authority to operate (rather than to other functions of the Cable Bureau). Indeed, there was no explanation of why 44.6 percent was chosen to represent that portion of the previously calculated "total costs" which could be recovered through a fee. Perhaps most importantly, there was no explanation of the criteria used in eliminating certain costs and retaining others (what, for example, differentiates the eliminated "general support" costs from the included "indirect costs to be allocated to application processing based on the essential nature of the support function performed"? 48 F.C.C.2d at 405). In short, the Commission appears to have gone at its task backwards, starting with totals and eliminating items rather than selecting certain expenses which are directly or indirectly related in a significant degree to the particular service which is the alleged justification for assessing the fee, and then adding up such items.
 
 
 39
 This is not to say that the Commission must calculate the exact cost of servicing each individual; that would be an all but impossible task.[40] Any computation such as those must necessarily be based on numerous approximations and can only be expected to be accurate within reasonable limits. It is sufficient for the Commission to identify the specific items of direct or indirect cost incurred in providing each service or benefit for which it seeks to assess a fee, and then to divide that cost among the members of the recipient class (here, cable operators) in such a way as to assess each a fee which is roughly proportional to the "value" which that member has thereby received.[41] The important step which the Commission has eliminated here is the identification of the specific items of cost and the criteria by which they are found to relate in the determined percentage to the service or benefit for which the fee is assessed.
 
 
 40
 The third criticism made of the Commission's action in adopting the 1975 annual authorization fee is that, even assuming arguendo that a proper cost basis had been calculated and explained, the fee which is assessed may in some instances bear no reasonable relation whatever to the expenses incurred on behalf of the payor. We agree. If a fee is calculated in a proper manner, it should be a reasonable approximation of the attributable costs which the Commission identifies as being expended to benefit the recipient. A "fee" is a payment for a special privilege or service rendered, and not a revenue measure.[42] If the "fee" unreasonably exceeds the value of the specific services for which it is charged it will be held invalid.[43] Thus, in a well reasoned opinion in State ex rel. Division v. Gorman, 40 Minn. 232, 233-234, 41 N.W. 948, 949 (1889), the Minnesota Supreme Court struck down a probate "fee" designed to reimburse the state for salaries paid to its probate judges, finding that the fee bore no reasonable relation to the services performed;[44] while in Finlayson v. Conner, 167 So.2d 569, 572-73 (Fla.1964), the Supreme Court of Florida upheld a registration "fee" imposed upon seed dealers after finding that the assessment had a reasonable relation to the costs of the service rendered by the state.[45]
 
 
 41
 Thus, the IOAA must be interpreted to limit the Commission to assessing fees at a rate which reasonably reflects the cost of services performed or the expense of other value transferred to the payor.[46] In order to assure this required relationship between the fee-rate and the services rendered, as we interpret the Supreme Court opinion, the agency must look not at the value which the regulated party may immediately or eventually derive from the regulatory scheme, but at the value of the direct and indirect services which the agency confers. This means, for example, that a fee, in order not to be a tax, cannot be justified by the revenues received or the profits which cable operators have made from their franchises, but must be reasonably related to those attributable direct and indirect costs which the agency actually incurs in regulating (servicing) the industry. Tangential costs that bear no nexus to the service rendered cannot be recovered by citing the benefits derived by the beneficiaries from their operation of their licenses.[47]
 
 
 42
 In this regard, in the absence of some specific justification, we hold serious doubts about the Commission's use of the number of subscribers to a particular cable television system as a means of determining the share of the Cable Bureau's total recoverable cost to be borne by that system. By setting the annual fee at 13cents per subscriber, see note 20 supra, the FCC has in effect adopted a fee justified and measured largely by the gross revenue of particular cable operators. This characterization of the fee is admitted by the agency:
 
 
 43
 Although monthly subscription rates do vary somewhat from one system to another, utilization of a system's subscriber count in determining the amount of the fee results in a fee reasonably related to earnings differences among systems. At the same time, it is convenient for use by the Commission in verifying the correctness of the amount paid, and avoids the need for reference to cable systems income data (net or gross) which should be respected as confidential in nature. It is apparent that the larger a cable operation is, the more its owners benefit from the cable system operating authority which they have received from the Commission. At the same time, the formula is designed to yield a total income not in excess of the total cost to the Commission of its activity in authorizing cable operation.
 
 
 44
 50 F.C.C.2d 906, 922 (1975) (emphasis added). While we do not hold that the Commission may under no circumstances assess a fee based on the number of subscribers, or on gross revenues, we interpret the mandate of the Supreme Court in NCTA to mean that the agency must in all cases demonstrate a "necessary, natural, or . . . probable correspondence between the sums to be paid . . . and . . . the character or extent of the services (rendered). . . ." State ex rel. Davidson v. Gorman, supra, 40 Minn. at 234, 41 N.W. at 949-50 (quoted in note 44 supra ). There is no evidence in the record before us that supports the conclusion that it costs the agency twice as much to authorize and regulate a cable system with 2000 subscribers as it does to authorize and regulate one with 1000 subscribers. Thus there is no way for us to verify that the fee is justified by the value conferred rather than by the profits derived by cable operators.
 
 
 45
 Again, we do not demand precise equality between the value conferred and the fee charged. To be valid, a fee need only bear a reasonable relationship to the cost of the services rendered by the agency. Finlayson v. Conner, supra, 167 So.2d at 572-73 (quoted in note 45 supra ). Considerations of administrative convenience may certainly be taken into account as one factor in the calculation. For example, the FCC could probably reasonably justify a minimum fee for small stations, and may well be able to demonstrate increases in the cost of regulating cable systems as the number of subscribers grows. However, it must also be recognized that economies of scale might result, making the per-subscriber cost of regulation less for a larger system (even though the total fee for that system might be greater). See note 45 supra. These are questions which the agency should address on remand.
 
 
 46
 Whatever standard the Commission uses as a basis for its rate it should not have the potentiality in any substantial number of individual instances to produce fees that are not reasonably related to the cost of the services that benefit the individual recipients who are being charged. The fee schedule should be reasonably related to the individual cost of services as well as to the total costs for the particular segments of recipients. This is required so that the "fee" does not become a "tax." In other words, the fact that the Commission may assess a class of recipients with a fee is no justification for imposing a tax upon some of the members of that class to produce the total cost of the service. Ability to pay is frequently used as a justification for levying a tax but is of very limited value in assessing a fee which is supposedly related as closely as reasonably possible to the cost of servicing each individual recipient. NCTA, 415 U.S. at 340, 94 S.Ct. 1146. However, this would not prohibit the use of a fee base with inherent ability to pay features if such base also reasonably reflected varying cost factors that benefitted individual recipients.
 
 III.
 
 47
 In conclusion, we remand this case to the Commission for (1) clarification of the justification for its fee, (2) an explanation of the specific items of direct and indirect expense that make up the cost basis of the fee, and (3) a reconsideration of the rate at which the fee is assessed. Because of the broad effect of our holding in this and the companion cases decided this date,[48] we recommend that the FCC not limit its consideration on remand to the fee in issue here, but rather review its entire 1975 fee schedule. In this process the Commission shall recalculate and collect the fees for the period here at issue in accordance with the principles announced in this opinion and in the companion cases decided today.[49]
 
 
 48
 Judgment accordingly.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(d)
 
 
 [1]
 50 F.C.C.2d 906 (1975). This order establishes both filing fees (e. g., fees paid upon filing applications for a certificate of compliance) and an annual authorization fee. See 47 C.F.R. § 1.1116 (1975). Only the annual fee is challenged in this suit
 
 
 [2]
 51 F.C.C.2d 372 (1975)
 
 
 [3]
 Act of Aug. 31, 1951, ch. 376, Title V, § 501, 65 Stat. 290, as codified, 31 U.S.C. § 483a (1970)
 
 
 [4]
 34 F.C.C. 811 (1963)
 
 
 [5]
 See 21 F.C.C.2d 502, 503 (1970)
 
 
 [6]
 Included among these were the Bureau of the Budget and several congressional committees. Id. See also H.R.Rep.No.91-316 at 7-8 (1969); H.R.Conf.Rep.No.91-649 at 6 (1969)
 
 
 [7]
 23 F.C.C.2d 880 (1970). See also National Cable Television Assn. v. United States, 415 U.S. 336, 340, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974)
 
 
 [8]
 Budget Circular No. A-25 (J.App. 129-34) was issued on Sept. 23, 1959. The circular provides in part:
 
 
 [3]
 General policy. A reasonable charge, as described below, should be made to each identifiable recipient for a measurable unit or amount of Government service or property from which he derives a special benefit
 a. Special services.
 (1) Where a service (or privilege) provides special benefits to an identifiable recipient above and beyond those which accrue to the public at large, a charge should be imposed to recover the full cost to the Federal Government of rendering that service. For example a special benefit will be considered to accrue and a charge should be imposed when a Government-rendered service:
 (a) Enables the beneficiary to obtain more immediate or substantial gains or values (which may or may not be measurable in monetary terms) than those which accrue to the general public (e. g., receiving a patent, crop insurance, or a license to carry on a specific business); or
 (b) Provides business stability or assures public confidence in the business activity of the beneficiary (e. g., certificates of necessity and convenience for airline routes, or safety inspections of craft); or
 (c) Is performed at the request of the recipient and is above and beyond the services regularly received by other members of the same industry or group, or of the general public (e. g., receiving a passport, visa, airman's certificate, or an inspection after regular duty hours).
 (2) No charge should be made for services when the identification of the ultimate beneficiary is obscure and the service can be primarily considered as benefitting broadly the general public (e.g., licensing of new biological products).
 (J.App. 130-31, emphasis added). The Court construed the italicized portion above as requiring that the person assessed have some nexus with the agency such as proceedings before it during the year in question.
 
 
 [9]
 46 F.C.C.2d 12 (1974). The Commission also ordered refund of all cable television annual fees which had been collected pursuant to the 1970 schedule. 49 F.C.C.2d 1089 (1974)
 
 
 [10]
 46 F.C.C.2d 12 (1974)
 
 
 [11]
 See 48 F.C.C.2d 402 (1974)
 
 
 [12]
 See note 1 supra
 
 
 [13]
 The order of the FCC proposing the 1975 fee stated: "It is proposed that an annual fee be adopted for cable television systems that would be assessed in the same manner as the fee adopted in Docket 18802 in 1970, although at a substantially reduced level." 48 F.C.C.2d at 417. See also id. at 406-07
 
 
 [14]
 Radio Broadcast Services; Common Carrier Services; Safety and Special Radio Services; Cable Television and Cable Relay Services; Field Operations (Commercial Radio Operator Applications); and Chief Engineer (Equipment Testing and Approval)
 
 
 [15]
 48 F.C.C.2d 402, 404-05 (1974); 23 F.C.C.2d 880, 882 (1970)
 
 
 [16]
 48 F.C.C.2d at 404. The FCC went on to state that "(i)t is our view that this approach is consistent with the Court's interpretation of the (IOAA), since the fees will recover only so much of the Commission's total costs as are attributable to work done to create value to the recipients. The costs of activities that are not directly related to the providing of specific services through application or tariff processing will not be recovered through the fee program." Id. This is a fine statement of a general objective, but the record does not contain detail sufficient to permit us to verify that the fees imposed conform to it
 
 
 [17]
 Id. at 405
 
 
 [18]
 (T)he Internal Equal Employment, Safety and Security, and Emergency Communications activities of the Executive Director's Office were excluded (because they were considered too far removed from a direct relationship with the processing of applications, the costs of which the new fee schedule was designed to recover. (See note 16 supra and accompanying test). The costs of the remaining activities of the Executive Director's office were allocated . . . on a pro rata basis. These costs were chosen as the only "indirect" costs to be allocated to application processing based on the essential nature of the support functions performed, e. g., payroll, personnel, management review, distribution of mail, procurement of supplies, etc
 Id.
 
 
 [19]
 The percentage used for the Cable Television Bureau was 44.6%. J.App. 152
 
 
 [20]
 For the Cable Bureau, the computation was as follows:
 "All costs" of Cable Bureau $2,252,808
Add: pro rata share of indirect costs 324,396
Subtotal: "Total projected costs" 2,577,204
 x .446
 -----------
"Application processing costs" 1,149,432
Add: allocated portion of Antenna Survey 8,082
Total: "Fee Recoverable Costs" 1,157,514
 J.App. 145, 152. The fee was then apparently set in the manner described in an internal memorandum from Walter Morse of the Cable Television Bureau to Daniel R. Ohlboum, Deputy General Counsel, dated June 25, 1974:
 1. * * *
 (d) In view of the foregoing, the FY 1975 fee collection target reported to the Cable Television Bureau by the FCC Budget Office is $1,157,514, a target to be reached by
 (1) estimating
 (i) the number of items to be received in FY 1975 in each of the fee-coolectible (sic) categories, and
 (ii) the average number of cable television subscribers in calendar year 1974 (the basis on which annual-fee payments will be made during FY 1975); and
 (2) proportionally scaling-down the fees set forth
 (i) in the existing (1970) fee schedule for cable and CAR applications referred to therein, and
 (ii) in the adopted-and-rescinded "Report and Order" in Docket No. 19658 (wherein proposed increases in the 1970 fee schedule were adopted and then rescinded shortly after the Supreme Court action. See 38 F.C.C.2d 587 (1972); J.App. 1-19) for the fee items referred to in paragraph 1(c) supra
 so that the new proposed fees, when respectively multiplied by the estimated number of pertinent items to be received in FY 1975, or the estimated number of cable subscribers in calendar year 1974, will yield a total anticipated revenue approximating the aforementioned fee-collection target.
 
 
 [2]
 By successive approximations, it was ascertained that such a scaling-down to 42 percent of the previous fee levels, followed by a rounding of each resultant filing-fee to the nearest multiple of 5, would yield the following fees and anticipated revenues:
 Fee No. of items: Revenue:
 --- ------------- --------
--CAR application:
 --For a construction
 permit $20 323 $ 6,460
 --For a license or
 renewal $ 5 103 $ 515
 --For a modification
 of construction
 permit or of license $ 5 120 $ 600
 --For reinstatement of
 an expired
 construction permit
 or license $ 5 9 $ 45
 --For assignment of
 license or construction
 permit or for
 transfer of control
 therefor $10 145 $ 1,450
 --Application for
 certificate pursuant
 to Section 76.11 $15 (or $5) 1,089 $ 10,890
 --Annual fee (per
 subscriber) $ 0.13 8,784,250 $1,141,952.50
 -------------
 --TOTAL $1,161,912.50
 The total anticipated revenue, as set forth in the above table, would be $4,398.50 above the fee-collection target specified by the Budget Office.
 J.App. 154-55 (footnote eliminated). The fees suggested in paragraph 2 are in fact the ones adopted by the Commission. Compare 47 C.F.R. § 1.1116 (1975).
 
 
 [21]
 51 F.C.C.2d 372 (1975)
 
 
 [22]
 See text accompanying notes 9-10 supra
 
 
 [23]
 Unlike the 1975 fee schedule, which has a fiscal 1975 cost basis, 48 F.C.C.2d at 405, the recalculated fees would employ fiscal year 1973 as a cost base. 51 F.C.C.2d at 372
 
 
 [24]
 Public Notice, FCC 75-952 (Aug. 7, 1975)
 
 
 [25]
 See note 1 supra
 
 
 [26]
 See also 50 F.C.C.2d at 920-21
 
 
 [27]
 "(T)he courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review. . . . (T)he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). See also 2 K. Davis, Administrative Law Treatise § 16.12 (1958)
 
 
 [28]
 The franchise, or license to operate, of a cable television system is granted by local authorities. 36 F.C.C.2d 141, 207-10 (1972). The system cannot operate, however, without a certificate of compliance issued by the FCC, 47 C.F.R. § 76.11(a) (1975), except that a cable television system in operation before March 31, 1972, is given a limited "grandfather" privilege it is allowed to continue in operation without a certificate of compliance until the end of its current franchise period or March 31, 1977, whichever occurs first. 47 C.F.R. § 76.11(b) (1975). Moreover, the FCC has set standards which local franchises must meet. 47 C.F.R. § 76.31 (1975)
 
 
 [29]
 For example, an exception is made for state-run, non-commercial educational television stations. See 47 C.F.R. § 76.11(a) (1975)
 
 
 [30]
 No cable television system lawfully carrying television broadcast signals in a community prior to March 31, 1972, shall continue carriage of such signals beyond the end of its current franchise period, or March 31, 1977, whichever occurs first, unless it receives a certificate of compliance
 
 
 [47]
 C.F.R. § 76.11(b) (1975)
 
 
 [31]
 The FCC's general authority to regulate the cable television industry was affirmed in United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), in which the Supreme Court found that "the Commission has reasonably concluded that regulatory authority over CATV is imperative if it is to perform with appropriate effectiveness certain of its other responsibilities." 392 U.S. at 173, 88 S.Ct. at 2003. In particular, the Court found that the Commission had reasonably determined that " 'the unregulated explosive growth of CATV,' " especially through "its importation of distant signals into the service areas of local stations" and the resulting division of audiences and revenues, threatened to "deprive the public of the various benefits of (the) system of local broadcasting stations" that the Commission was charged with developing and overseeing under section 307(b) of the Act. 392 U.S. at 175, 88 S.Ct. at 2004. See also United States v. Midwest Video Corp., 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972). On the other hand, this court has recently recognized that "(t)he Commission's authority to adopt the regulatory scheme embodied in the 1972 (franchise) Rules has not yet been judicially tested." TelePrompTer Cable Systems, Inc. v. FCC, --- U.S.App.D.C. ---- at ---- n.6, 543 F.2d 1379 at 1383 n.6 (1976). The Commission's authority in the franchise area has also been questioned by the staff of the House Subcommittee on Communications. See generally Staff of Subcommittee on Communications of the House Committee on Interstate and Foreign Commerce, 94th Cong., 2d Sess., Cable Television: Promise Versus Regulatory Performance 80-83 (Subcomm. Print 1976). Given our disposition of this case, it will be time enough to consider questions of the precise scope of the Commission's authority once it has clarified the justifications for imposing fees on cable system operators
 
 
 [32]
 Cable television certificates of compliance meet the definition of "license" in 47 U.S.C. § 153(cc) (1970) and 5 U.S.C. § 551(8) (1970)
 
 
 [33]
 The Supreme Court quoted this passage with approval in NCTA, stating that while it concerns television and radio broadcasters, what was said is "germane to the CATV problem." 415 U.S. at 343-44, 94 S.Ct. at 1150
 
 
 [34]
 See text infra, 180 U.S.App.D.C. at ----, 554 F.2d at 1097
 
 
 [35]
 48 F.C.C.2d at 404
 
 
 [36]
 See also 50 F.C.C.2d at 908. The Commission's statement that it is permitted "to charge a fee to the recipients of the services that will allow those services provided by the Commission to be operated on a self-sustaining basis as mandated in (the IOAA)," 48 F.C.C.2d at 404 (emphasis added), if taken as an absolute, is on a direct collision course with the holding of the Supreme Court that it was not in accordance with the intent of the statute to obtain reimbursement of the "total cost (direct and indirect) to the Commission for operating . . . a CATV unit of supervision (because) (c) ertainly, some of the costs inured to the benefit of the public . . .." 415 U.S. at 343, 94 S.Ct. at 1150. See text 180 U.S.App.D.C. at ----, 554 F.2d at 1103 supra. Also, those charges for services rendered where identification of the ultimate beneficiary is obscure cannot be recovered in fees. 415 U.S. at 350, 94 S.Ct. 1151 quoted in text 180 U.S.App.D.C. at ----, 554 F.2d at 1097-1098 supra. See also Electronic Industries Assn. v. FCC, 180 U.S.App.D.C. ---- at ---- - ----, 554 F.2d 1109 at 1114-1117 (1976)
 
 
 [37]
 See also 50 F.C.C.2d at 908
 
 
 [38]
 See Electronic Industries Assn. v. FCC, 180 U.S.App.D.C. ---- at ---- - ---- n. 12, 554 F.2d 1109 at 1114, n. 12 (1976)
 
 
 [39]
 See generally text at notes 16-20 supra
 
 
 [40]
 In the case which first upheld the constitutionality of the IOAA, the Seventh Circuit stated:
 We think petitioners ask too much in claiming the identification of Commission function and costs with respect to each of the over 500,000 yearly applicants. The general terms are sufficient to inform applicants what services are rendered in considering applications for licenses for use of radio in the various categories.
 Aeronautical Radio, Inc. v. United States, 335 F.2d 304, 309 (7th Cir. 1964), cert. denied, 379 U.S. 966, 85 S.Ct. 658, 13 L.Ed.2d 559 (1965). To the extent that this passage is interpreted to mean that the Commission need not specify the exact cost of each benefit rendered to each individual, we agree with it. "Allocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science. Hamilton, Cost as a Standard for Price, 4 Law & Cont. Prob. 321." Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945). See also Clay Broadcasting Corp. of Texas v. United States, 464 F.2d 1313, 1317-18 (5th Cir. 1972), rev'd on other grounds, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974). In light of the subsequent Supreme Court decisions in this area, however, we do not believe Aeronautical Radio can be read to allow the agency to identify only the general services or benefits for which they are charging and the total cost which they seek to recover. As we have previously explained, that information is insufficient to allow a reviewing court to determine that the "value to the recipient" standard has been met.
 41See text infra, 180 U.S.App.D.C. at ----, 554 F.2d at 1105-1109.
 
 
 [42]
 Stewart v. Verde River Irrigation & Power District, 49 Ariz. 531, 68 P.2d 329 (1937); Gunby v. Yates, 214 Ga. 17, 102 S.E.2d 548 (1958); Dickson v. Jefferson County Board of Education, 311 Ky. 781, 225 S.W.2d 672 (1949); Leggett v. Missouri State Life Insurance Co., 342 S.W.2d 833, 875 (Mo.1960); State ex rel. Attorney General v. Wisconsin Constructors, Inc., 222 Wis. 279, 268 N.W. 238 (1936). As such, the fee must reasonably relate to the value of the services performed. State v. Montevallo Coal Mining Co., 29 Ala.App. 318, 197 So. 82, cert. denied, 240 Ala. 73, 197 So. 87 (1940); Volusia County Kennel Club, Inc. v. Haggard, 73 So.2d 884 (Fla.), cert. denied,, 348 U.S. 865, 75 S.Ct. 87, 99 L.Ed. 681 (1954); Cook County v. Fairbank, 222 Ill. 578, 78 N.E. 895 (1906); Vernor v. Secretary of State, 179 Mich. 157, 146 N.W. 338 (1914); Willis v. Standard Oil Co., 50 Minn. 290, 52 N.W. 652 (1892); State v. Cox, 91 N.H. 137, 16 A.2d 508 (1940), aff'd, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); Malin v. La Moure County, 27 N.D. 140, 145 N.W. 582 (1914); Carter v. State Tax Commission, 98 Utah 96, 96 P.2d 727 (1939); Smith v. Carbon County, 90 Utah 560, 63 P.2d 259 (1936); State ex rel. Nettleton v. Case, 39 Wash. 177, 81 P. 554 (1905); State ex rel. Sanderson v. Mann, 76 Wis. 469, 45 N.W. 526 (1890)
 
 
 [43]
 Union Brokerage Co. v. Jensen, 322 U.S. 202, 210-11, 64 S.Ct. 967, 88 L.Ed. 1227 (1944); New Mexico ex rel. E. J. McLean & Co. v. Denver & Rio Grande R.R., 203 U.S. 38, 55, 27 S.Ct. 1, 51 L.Ed. 78 (1906); Jackson v. O'Connell, 114 Fla. 705, 710, 154 So. 697, 699 (1934) ("It is quite well settled that as a general principle the amount which may be required under an ordinance . . . must be limited and reasonably measured by the costs of the issuance of the license and the costs incident to regulating and inspecting the activity for which the license is required."); Cook County v. Fairbank, supra ; Vernor v. Secretary of State, supra ; State v. Bartles Oil Co., 132 Minn. 138, 155 N.W. 1035 (1916); Leggett v. Missouri State Life Insurance Co., supra ; Niemiec v. King, 109 N.H. 586, 258 A.2d 356 (1969); State v. Cox, supra ; Hanson v. Griffiths, 204 Misc. 736, 124 N.Y.S.2d 473 (1953), aff'd, 283 App.Div. 662, 127 N.Y.S.2d 819 (1954); Smith v. Carbon County, supra ; State ex rel. Nettleton v. Case, supra ; Meyers v. Matthews, 270 Wis. 453, 460, 71 N.W.2d 368, 372, (1955), appeal dismissed, 350 U.S. 927, 76 S.Ct. 303, 100 L.Ed. 811 (1956) ("the test of a reasonable fee is that it shall be no greater than is sufficient to cover the expenses of administration."); State ex rel. Attorney General v. Wisconsin Constructors, Inc., supra ; State ex rel. Sanderson v. Mann, supra ; cf. D. E. Foote & Co. v. Stanley, 232 U.S. 494, 503, 34 S.Ct. 377, 58 L.Ed. 698 (1914); Roach v. City of Durham, 204 N.C. 587, 169 S.E. 149 (1933)
 
 
 [44]
 The Gorman court stated:
 But the sums required by this act to be paid into the county treasury must be regarded as "taxes," in the ordinary sense of that word, and as it is used in the (state) constitution. They are not in any proper sense fees or costs assessed impartially, or with regard to the expense occasioned or services performed. The amounts are regulated wholly, but arbitrarily, with regard to the value of the estate. They have no proximate relation to the amount of the compensation to be paid to the probate judge, nor to the other expenses of the court, nor to the nature or extent of the services which may become necessary in the proceedings. There is no necessary, natural, or even probable correspondence between the sums to be paid (widely different in amounts with respect to estates of different values) and the nature of the proceedings, or the character or extent of the services, which may be required in the probate court. It cannot be assumed, upon any ground of probability, that these proceedings or services will be different or greater in the case of an estate of the value of more than $500,000 than in one of the value of from $35,000 to $50,000, yet in the former case $5,000 must be paid; in the latter, $100. The formerly existing law for the payment of fees for the services of the probate judge is superseded. The only compensation which the probate judge may now receive for the performance of his judicial duties is a salary, fixed in amount, and payable from the county treasury. That salary is in no manner dependent upon, or affected by, the amounts which may be paid into the county treasury under this law; and, if such payments shall exceed the amount of the judge's salary, no reimbursement to the estates or persons making such payments is contemplated.
 It is thus apparent that these exactions are "taxes" in the general and in the precise meaning of that word . . ..
 
 
 [40]
 Minn. at 233-235, 41 N.W. at 949-50
 
 
 [45]
 The Finlayson court held:
 While a revenue measure based on gross receipts must apply equally to all for the privilege of doing the same act, that is, making a sale or completing a transaction, the test of the validity of an inspection fee is that such fees must bear a reasonable relationship to the cost of the inspection service or the protection rendered thereby. See 44 C.J.S. Inspection, § 12, and cases cited therein.
 Even if the registration fee in this case were held to be a license tax, the fact that those making greater use of the privilege are charged a larger fee (but one that represents a smaller percentage of the total sales of the dealer) would not invalidate the tax.
 This Court has repeatedly held that a license tax need not be identical for each licensee, and that it need not be limited to the exact expense of issuing the license. We have held that licenses ar (sic) fees charged for services rendered, and may include any reasonably probable cost of supervision, regulation, inspection and examination that may be required to be rendered by the licensing authority. To be valid such charges only need be commensurate with the services required to be rendered by the licensing body. State ex rel. James v. Gerrell, 1938, 137 Fla. 324, 183 So. 812; State ex rel. Harkow v. McCarthy, 1936, 126 Fla. 433, 171 So. 314; Jackson v. O'Connell, 1934, 114 Fla. 705, 154 So. 697; Heriot v. City of Pensacola, 1933, 108 Fla. 480, 146 So. 654; City of Jacksonville v. Ledwith, 1890, 26 Fla. 163, 7 So. 885, 9 L.R.A. 69; and Young v. Thomas, 1879, 17 Fla. 169, 35 Am.Rep. 93.
 The cost of inspection and enforcement no doubt increases with the quantity of seed involved. However, the cost is not likely to increase in direct proportion to the increase in quantity of seed measured by dollar volume of gross sales or otherwise. This is so because in all probability it costs less to inspect seed in larger lots than in smaller ones. Therefore, it requires no effort to find a reasonable relationship between the cost of the service rendered by the state and the graduated registration fee imposed on those who receive the service.
 
 
 [167]
 So.2d at 572-73
 
 
 [46]
 The legislative history of the IOAA indicates that it was designed to recoup costs. See H.R.Rep.No.384, 82d Cong., 1st Sess. 2-3 (1951); 97 Cong.Rec. 4809 (1951) (statement of Cong. Yates). These segments of the legislative history were favorably cited by the Supreme Court in NCTA, 415 U.S. at 337, 343, 94 S.Ct. at 1147, 1150
 
 
 [47]
 For a discussion of the issues raised as to the "value to recipient" standard by Judge Tamm's concurring opinion in National Assn. of Broadcasters v. FCC, 180 U.S.App.D.C. ----, 554 F.2d 1118 (1976), which is also decided today, see n.28 of that opinion
 
 
 [48]
 Electronic Industries Assn. v. FCC, 180 U.S.App.D.C. ----, 554 F.2d 1109 (1976); National Assn. of Broadcasters v. FCC, 180 U.S.App.D.C. ----, 554 F.2d 1118 (1976); Capital Cities Communications, Inc. v. FCC, --- U.S.App.D.C. ----, 554 F.2d 1135 (1976)
 
 
 [49]
 See National Assn. of Broadcasters v. FCC, 180 U.S.App.D.C. ---- at ----, 554 F.2d 1118 at 1133 (1976)