**AIR TRANSPORT ASSOCIATION OF AMERICA, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

No. 83–1174.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 1, 1983.

Decided April 20, 1984.

Harper B. Atherton, with whom David R. Murchison, Washington, D.C., was on the brief, for petitioner.

David Schaffer, Atty., C.A.B., Washington, D.C., with whom Ivars V. Mellups, Acting Gen. Counsel, and Thomas L. Ray, Asst. Gen. Counsel, C.A.B., and John P. Powers, III, and Frederic Freilicher, Attys., U.S. Dept. of Justice, Washington, D.C., were on the brief, for respondent.

Before TAMM and SCALIA, Circuit Judges, and LUTHER M. SWYGERT,* Senior Circuit Judge for the Seventh Circuit.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

Petitioner, Air Transport Association of America, seeks review of Civil Aeronautics Board (Board) order OR–204, 48 Fed.Reg. 635 (1983).[1] The order revised the Board's filing fee schedule and adopted a refund policy for excess fees collected after 1977. Petitioner challenges the order on procedural and substantive grounds. Although the Board's order is procedurally sound, we find that its refund policy has an unlawful retroactive effect. Accordingly, we remand this case to the Board for proceedings consistent with this opinion.

## I. BACKGROUND

### A. *Statutory Framework*

Petitioner's challenges are directed at the Board's establishment of fees pursuant

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

**1.** Petitioner also seeks review of the following orders, all of which relate to OR–204: ER–1318, 48 Fed.Reg. 3717 (1983); ER–1317, 48 Fed.Reg. 3717 (1983); OR–206, 48 Fed.Reg. 1941 (1983); OR–205, 48 Fed.Reg. 404 (1983).

to the Independent Offices Appropriation Act of 1952 (IOAA), 31 U.S.C. 483a (1976). The IOAA confers on agencies the authority to assess fees for services rendered to members of regulated industries. Congress enacted the IOAA so that services provided by agencies would become self-sustaining to the fullest extent possible. *Id.* In prescribing fees, agencies are instructed to consider "direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts ...." *Id.*

In 1974, the Supreme Court narrowly construed agencies' authority under the IOAA to charge fees. In two companion cases, the Court found that the fee schedules being challenged were overbroad and therefore constituted taxes, which generally may be levied only by Congress. *Federal Power Comm'n v. New England Power Co.*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974); *National Cable Television Ass'n v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974) [hereinafter cited as *NCTA* ]. The Court stated that permissible fees under the IOAA included "only specific charges for specific services to specific individuals or companies."[2] *New England Power Co.*, 415 U.S. at 349, 94 S.Ct. at 1154.

The decisions in *NCTA* and *New England Power Co.* prompted challenges to other agency fee schedules.[3] As a result, this court in 1976 articulated specific standards to which agencies must adhere when calculating fee schedules:

First, the [agency] must *justify* the assessment of a fee by a clear statement of the particular service or benefit which it is expected to reimburse. Second, it must calculate the *cost basis* for each fee assessed.... Finally, the [agency] must set a fee calculated to return this cost basis at a *rate* which reasonably reflects the cost of the services performed and value conferred upon the payor. The fees may be imposed only on beneficiaries of agency services who satisfy the criteria of *NCTA* and *New England Power.*

*Electronic Industries Ass'n v. FCC*, 554 F.2d 1109, 1117 (D.C.Cir.1976). *See also National Ass'n of Broadcasters v. FCC*, 554 F.2d 1118, 1133 (D.C.Cir.1976). These standards established the criteria against which agencies could measure the legality of fees assessed pursuant to the IOAA.

### B. *Procedural Background*

1. The Board's Fee Schedules from 1968 to 1982

The Board first established filing fees and license fees in 1968. *See* OR–27, 33 Fed.Reg. 68 (1968), Joint Appendix (J.A.) at 43.[4] The Board intended these fees to recover about one-fourth of the direct costs the Board incurred in providing specific services to specific individuals. J.A. at 46. This assessment, according to the Board, represented reasonable fees under the IOAA. J.A. at 45, 46. Although the method used by the Board in calculating these fee schedules did not conform to IOAA

---

**2.** By contrast, Congress, when levying taxes, may "disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income." *National Cable Television Ass'n*, 415 U.S. at 340, 94 S.Ct. at 1148.

**3.** In 1976, this court reviewed such challenges in the following companion cases: *Capital Cities Communications, Inc. v. FCC*, 554 F.2d 1135 (D.C.Cir.1976); *National Ass'n of Broadcasters v. FCC*, 554 F.2d 1118 (D.C.Cir.1976); *Electronic Industries Ass'n v. FCC*, 554 F.2d 1109 (D.C.Cir. 1976); *National Cable Television Ass'n v. FCC*, 554 F.2d 1094 (D.C.Cir.1976).

**4.** The filing fees established in OR–27 consisted of charges for the processing of various types of documents that required Board action. Filing fees ranged from $1 per page for filing tariffs to $2,000 for an application for merger, consolidation, or acquisition of control of direct air carriers. Joint Appendix (J.A.) at 60–64.

License fees consisted of charges to carriers that obtained new or amended certified route authority pursuant to section 401 of the Federal Aviation Act, 49 U.S.C. § 1371 (1976). The license fee was based on the carrier's annual gross transport revenue increase, as estimated by the Board, for the carrier's first full year of operations resulting from the new route authority. J.A. at 61.

guidelines, *see infra* note 8, no carrier filed a petition for review.

In 1973, the Board revised the 1968 fee schedule because the fees collected pursuant to the old schedule no longer covered one-fourth of the Board's direct costs.[5] *See* OR–80, 38 Fed.Reg. 31960 (1973), J.A. at 82. The method used by the Board in calculating the revised fees was substantially the same as that used in calculating the 1968 fees. J.A. at 68, 82. Once again, even though the fee schedules did not conform to IOAA guidelines, no carrier filed a petition for review.

In March 1977, the Department of Justice petitioned the Board to reexamine its license fee schedule on the ground that the license fees constituted an unlawful tax. Petition for Rulemaking, Docket 30586 (Mar. 7, 1977), J.A. at 99. On April 8, 1977, the Board suspended the collection of license fees pending an analysis of their lawfulness. Order 77–4–42, Docket 30586 (Apr. 8, 1977), J.A. at 110–11. The Board did not, however, suspend the collection of filing fees or alter the filing fee schedule.[6]

On April 28, 1977, six charter air carriers petitioned the Board to suspend the payment of filing fees and to refund all license and filing fees paid since 1968. Petition of Certain Supplemental Air Carriers for Refund of All License and Filing Fees, Docket 30816 (Apr. 28, 1977), J.A. at 113. The petition alleged that the Board's entire fee schedule, both for license and filing fees, imposed unlawful taxes. The Board took no apparent action in response to this petition until 1982 when it commenced the rulemaking proceeding for OR–204.

## 2. The Rulemaking Proceeding for OR–204

### a. *Notice of Proposed Rulemaking*

On February 1, 1982, the Board issued a notice of proposed rulemaking in which it proposed to revise the filing fee schedule, to eliminate license fees, and to deny refunds for fees paid pursuant to the earlier fee schedules. ODR–25, 47 Fed.Reg. 7746 (1982), J.A. at 137. The Board stated that its proposed filing fee schedule complied with the IOAA as interpreted both by the Supreme Court and this court.[7] Although the Board conceded that the method it had used to calculate its previous fee schedules

---

5. The necessity of a fee schedule revision resulted in large part from increased costs. The Board's salary and expense appropriation had grown by 80% since the 1966 fiscal year, from $7.9 million to $14.3 million. J.A. at 67–68. The Board estimated that the costs of fee-associated activities in the 1973 fiscal year was $4.2 million. Under the 1968 fee schedule, only $415 thousand, or about 10% of these costs, was recovered. J.A. at 67–68.

6. The Board noted that only its license fee schedule, and not its filing fee schedule, had been challenged. J.A. at 111. Moreover, the Board contended that its filing fees complied with IOAA requirements. J.A. at 111.

7. In addition to providing an analysis of the proposed fee schedule, J.A. at 143–44, the Board provided the following explanation:

> We are proposing ... to change the present filing fees so that there would be a single processing fee based on the specific costs at each step in the process of providing the services. Only those services with a known beneficiary would be included. In developing the proposal, we looked at each office and bureau within the Board to find out what services it performs. Services for which the beneficiary is obscure or which confer an independent public benefit, such as analyses of the Office of Economic Analysis or the Office of General Counsel, or hearings (after a decision has been made whether to proceed by show-cause procedures or by oral evidentiary procedures) would be excluded from the fee schedule. Once the services for known beneficiaries were identified, the basic document for that service, usually an application, would be followed through each step in its processing. Costs would then be assessed for each step. Each document that began a separate, identifiable stage in the process, and that required a special service for a particular person, would be assessed a fee. For example, in a certificate proceeding, additional certificate applications or a request to supplement an application by an exemption would each be charged a separate fee. In this way, the fees would be fair and equitable for all, and evenly distributed. We believe that this proposal meets the criteria stated by the courts, and the intent of Congress in the Independent Offices Appropriation Act.

J.A. at 138. *See also* J.A. at 139.

had not conformed to IOAA guidelines,[8] the Board nevertheless proposed to deny the air carriers' request for a refund of fees paid since 1968. In support of its position, the Board observed that this court had required another agency whose fee schedule had been improperly calculated to refund fees only to the extent that they exceeded the amounts that lawfully could have been charged. J.A. at 147 (citing *National Ass'n of Broadcasters v. FCC*, 554 F.2d 1118 (D.C.Cir.1976)). Because the Board had attempted in its earlier fee schedules to recover only one-fourth of its direct costs and had not even assessed fees for indirect costs, the Board decided that refunds probably would not be necessary. J.A. at 147.

### b. The Final Rule

On January 6, 1983, the Board adopted the final rule, OR–204, 48 Fed.Reg. 635 (1983), J.A. at 240. Pursuant to this rule, the Board established a new filing fee schedule. Additionally, the Board found that laches barred refunds of fees paid before April 28, 1977, the date on which carriers first petitioned the Board to refund all fees.[9] J.A. at 258. Finally, contrary to its proposal in the notice, the Board allowed refunds for filing fees paid after April 28, 1977 to the extent that the total fees paid during any calendar year exceeded the amount that the Board legally could have assessed for that year. J.A. at 257. The Board recalculated the fees that legally could have been assessed according to the current, revised formula it used in cal-

culating the new fee schedule. J.A. at 260. The recalculated fees were based on 1977 costs and current processing times, both of which favored the carriers.[10] The following refund procedure was then used:

> [A carrier's refund] application is to state the specific fee for which a refund is asked, the amount paid, and the total amount paid by the carrier in that calendar year for all fees. The comptroller ... will review the application, offsetting any amounts overpaid by amounts underpaid, based on the recalculation of the fees as discussed above.

J.A. at 262. The new rule became effective on January 10, 1983, four days after publication in the Federal Register. J.A. at 262.

Petitioner, Air Transport Association of America, challenges procedural and substantive aspects of the Board's final order. Specifically, petitioner raises the following three challenges: 1) the Board failed to comply with the Administrative Procedure Act in adopting OR–204; 2) the Board erred in relying on the doctrine of laches for denying refunds of fees paid between 1968 and 1977; and 3) the Board's refund policy for fees paid since 1977 has an unlawful retroactive effect. We address these claims in turn.

## II. ANALYSIS

### A. Petitioner's Procedural Challenges to OR–204

■ Petitioner first asserts that the Board denied the public the opportunity to

---

8. The Board noted three deficiencies in its earlier method of fee schedule calculations: "1) it exclude[d] recoverable indirect costs; 2) it recover[ed] less than the full cost to the government, and 3) the reasonableness of the less than full recovery was based on a criterion prohibited for use in fee development by later court decisions." J.A. at 146.

9. Alternatively, the Board denied refunds because the fees assessed before April 28, 1977 probably did not exceed what the Board legally could have assessed. *See* J.A. at 259.

10. "Processing time" is the average time spent by each bureau for each step in a document's path, broken down by employee-hours. J.A. at

143. The Board used current processing times for the recalculated fee schedule because this approach favored the carriers:

> In order to take the most conservative approach [in recalculating fees that the Board could have charged since 1977], the Board used the times reported for processing those items today. The year 1977 was only 1 year before the Airline Deregulation Act took effect. Since the Deregulation Act with its emphasis on expedited procedures and zones of reasonableness for domestic passenger prices, the Board's processing times for all work times have decreased. The times reported today in this rule are therefore shorter than they would have been in 1977.

J.A. at 259.

make meaningful comments on OR–204 in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 553 (1982). Some of the processing times used to calculate the new fee schedule were based on internal staff studies that were not made available to the public for review and comment prior to the rule's adoption. Petitioner contends that the Board's failure to make these staff studies available prior to adoption of the final rule renders the rule invalid.

The genesis of these staff studies was a joint memorandum from the Board's General Counsel and Managing Director to the Board's Bureau and Office Directors. This memorandum, issued some nine months after the notice of proposed rulemaking, was prompted by public comments that had "strongly challenged" calculations relating to the proposed fee schedule. J.A. at 386. The memorandum instructed each director to update with "accurate and justifiable" figures the time typically spent in processing particular documents and the grade range of the staff members performing the work. J.A. at 386. The resultant staff studies revealed that some data required correcting and, accordingly, some fees in the final rule were either higher or lower than those proposed in the notice. The staff studies were placed in the public docket at the close of rulemaking. J.A. at 248–53.

Notwithstanding these staff studies, we find that the Board's notice complied with the APA. The APA requires that an agency set forth in its notice of proposed rulemaking "either the terms or substance ... or a description of the subjects and issues involved" in the proposed rule. 5 U.S.C. § 553(b)(3). Thereafter, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or argu-

ments...." 5 U.S.C. § 553(c). We believe the Board's notice was "sufficiently descriptive of the 'subjects and issues involved' so that interested parties [could] offer informed criticism and comments." *National Small Shipments Traffic Conference, Inc. v. CAB,* 618 F.2d 819, 834 (D.C.Cir.1980) (quoting *Ethyl Corp. v. EPA,* 541 F.2d 1, 48 (D.C.Cir.) (*en banc*), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976)). In its notice, the Board both outlined the method by which it proposed to calculate the fees and listed the types of fees it proposed to charge. J.A. at 143–44. These critical elements of the proposal did not change, and the final rule was a "logical outgrowth" of the proposed rule.[11] *See Small Refiner Lead Phase-Down Task Force v. EPA,* 705 F.2d 506, 547 (D.C.Cir.1983).

■ Contrary to petitioner's argument, the statutory duty to submit a proposed rule for comment does not include an obligation to provide new opportunities for comment whenever the final rule differs from the proposed rule. As this court stated in *Connecticut Light and Power Co. v. NRC,* 673 F.2d 525, 533 (D.C.Cir.1982):

> An agency adopting final rules that differ from its proposed rules is required to renotice when the changes are so major that the original notice did not adequately frame the subjects for discussion.... The agency need not renotice changes that follow logically from or that reasonably develop the rules it proposed originally. Otherwise, the comment period would be a perpetual exercise rather than a genuine interchange resulting in improved rules.

*See also Weyerhaeuser Co. v. Costle,* 590 F.2d 1011, 1031 (D.C.Cir.1978); *Action for*

---

**11.** Significantly, petitioner does not claim that the time estimates are erroneous or that the final fees are excessive. Petitioner also does not explain what it would have said had it been given earlier access to the staff studies. Under such circumstances, any error generally would be found harmless. *See* 5 U.S.C. § 706 (1982) (the reviewing court must reverse agency action taken "without observance of procedure re-

quired by law" after taking "due account ... of the rule of prejudicial error"). *See also Small Refiner Lead Phase-Down Task Force v. EPA,* 705 F.2d 506, 540–41 (D.C.Cir.1983) ("It is also incumbent upon a petitioner objecting to the agency's late submission of documents to indicate with 'reasonable specificity' what portions of the documents it objects to and how it might have responded if given the opportunity.").

*Children's Television v. FCC,* 564 F.2d 458, 470 (D.C.Cir.1977).[12]

■ Petitioner also argues that the Board's notice was inadequate because the Board (1) failed to identify the method by which it intended to calculate the processing times, and (2) did not indicate that it intended to make findings as to the beneficiaries of its services. Again, however, we find that the notice adequately framed the subjects. The notice outlined the path that each document followed until final action. J.A. at 143, 154–56. The notice explained that each bureau determined the average processing time required for each step in the document's path, broken down by employee-hours. J.A. at 143. Each processing time was explicitly listed in the notice. J.A. at 144, 154–56. The notice also stated that fees would be charged only for services with a known beneficiary; services for which the beneficiary was obscure or that conferred an independent public benefit were excluded. J.A. at 138. Moreover, each document for which the Board proposed to charge fees was listed in the notice. J.A. at 150–51, 154–56. After considering the notice in its entirety, we find that the Board's discussion of the disputed subjects fulfilled its obligation "to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible." *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 36 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89, *petition for reh'g denied,* 434 U.S. 988, 98 S.Ct. 621, 54 L.Ed.2d 484 (1977).

■ Finally, petitioner contends that the rule should be invalidated because the Board lacked good cause to make the filing fee schedule effective four days after publication. *See* 5 U.S.C. § 553(d) (publication of a rule shall be made not less than thirty days before its effective date except for good cause found and published with the rule). Although exceptions to the thirty-day requirement are "narrowly construed and only reluctantly countenanced," *American Federation of Gov't Employees v. Block,* 655 F.2d 1153, 1156 (D.C.Cir.1981) (quoting *New Jersey Dep't of Environmental Protection v. EPA,* 626 F.2d 1038, 1045 (D.C.Cir.1980)), we agree with the Board that good cause existed for hastening the effectiveness of this rule. Because the new fee schedule reduced many fees, J.A. at 150–51, 265–66, the Board properly expedited the date of the rule's effectiveness "[s]o that no person [would] be disadvantaged or treated discriminatorily, and so that accurate fees [could] be paid ...." J.A. at 262. *See generally Capital Cities Communications v. FCC,* 554 F.2d 1135, 1139 (D.C.Cir.1976).

**B.** *Refunds of Fees Assessed Pursuant to Earlier Fee Schedules*

1. Laches as a Ground for Barring Refunds for Fees Assessed Before 1977

■ Petitioner attacks the Board's reliance on the doctrine of laches in denying refunds of fees assessed from 1968 to 1977.[13] To establish laches, the Board must show that the carriers' delay in challenging the fee schedules and in asserting refund claims was unreasonable, and that such delay prejudiced the Board. *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 843 (D.C.Cir.1982). Contrary to petitioner's assertions, we find that the Board met this burden.

■ Petitioner first argues that it cannot be accused of unreasonable delay, because

---

**12.** The staff studies at issue concerned internal agency practices such as processing times and the grade range of the staff members performing the work. These studies, which were generated in response to public comments, enabled the Board to calculate accurately the fees it had already adequately described. J.A. at 249. Moreover, the changes in the final fee schedule that resulted from the staff studies cannot be considered major.

We emphasize that we do not hold that public comments on internal agency practices are never required. We simply hold that the Board's notice here adequately described the subjects and issues involved so the public had a meaningful opportunity to comment.

**13.** The amount of refunds at issue in this case includes $3.2 million in license fees paid from 1968 to 1977, and $8.6 million in filing fees paid from 1968 to 1981. J.A. at 233, 234.

its petition for refunds in April 1977 followed only four months after this court articulated the standards by which fees could lawfully be assessed under the IOAA. *See supra* note 3. Petitioner ignores, however, that its claim came nine years after the Board adopted the fee schedules, four years after the Board increased the fees pursuant to a rulemaking procedure, and three years after the Supreme Court narrowly construed the IOAA in *National Cable Television Ass'n v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), and *Federal Power Comm'n v. New England Power Co.*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974). We believe that petitioner has not adequately explained this delay in challenging the Board's fee schedule.

Petitioner is equally unsuccessful in arguing that the Board was not prejudiced by the industry's delay. Due to the industry's lack of diligence in challenging the fee schedules before 1977, records are not available from which the Board could now accurately recalculate fees that it could have collected. J.A. at 259. The Board therefore would be denied its right to retain the maximum portion of fees collected before 1977 that would be permissible under the IOAA.[14] *National Ass'n of Broadcasters v. FCC*, 554 F.2d 1118, 1133 (D.C. Cir.1976). To require the Board to distribute imprecise refunds based on aged, inadequate records would result in the type of prejudice that the doctrine of laches is designed to prevent.[15] *See generally Galliher v. Cadwell*, 145 U.S. 368, 12 S.Ct. 873, 36 L.Ed. 738 (1892).

### 2. Refund Policy for Fees Assessed After 1977

■ Finally, petitioner urges us to find unlawful the Board's refund policy for fees assessed after 1977. Pursuant to this policy, the Board recalculated the fees it could have charged since 1977 according to the same formula it used to calculate the current fee schedule, but with times and costs that favored the industry. *See supra* note 10. An air carrier seeking a refund must state both the specific fee for which a refund is asked and the total fees it paid during the calendar year of the payment in question. The Board "offsets" the total fees that the carrier paid during that calendar year against the recalculated fees that the Board could have charged. A carrier is entitled to a refund only to the extent that the *total* fees it paid during a calendar year exceeded the *total* amount the Board could have assessed. Petitioner argues that the Board's "offsetting" refund procedure in some cases has the unlawful effect of raising fees retroactively. We agree.

The Board contends that its refund policy conforms to the approach approved by this court in *National Ass'n of Broadcasters v. FCC*, 554 F.2d 1118 (D.C.Cir.1976). There, this court rejected the argument that *all* fees collected under a fee schedule not

14. Although a similar inaccuracy may underlie the Board's recalculation of post-1977 fees, *see supra* note 10, we find it equitable that the Board incur whatever cost such inaccuracy involves. Once petitioner challenged the legality of the fee schedule, the Board was on notice that it should compile and retain precise records.

15. For nine years, from 1968 to 1977, the airline industry received the benefit of the Board's services and paid fees for those services without protest. Recalculating an accurate fee schedule for that period is not now possible. J.A. at 259. Requiring a full refund, as petitioner suggests, would leave industry members with the benefit of those services and deprive the government of

any compensation for having provided those services. Such a result would be inequitable as well as contrary to congressional intent as reflected in the IOAA. *See National Ass'n of Broadcasters v. FCC*, 554 F.2d at 1133.

Although the method used by the Board in calculating the 1968 and 1973 fee schedules did not comply with the IOAA standards as articulated by this court in 1976, *see infra* note 8, the Board assessed fees only against carriers who sought specific benefits from the Board. Such fees, if properly calculated, are justified under the IOAA. *See, e.g., Mississippi Power and Light Co. v. NRC*, 601 F.2d 223 (5th Cir.1979) (licenses); *Electronic Industries Ass'n v. FCC*, 554 F.2d 1109 (D.C.Cir.1976) (tariffs).

calculated in accordance with the IOAA should be refunded:

> [The] congressional mandate, expressed in IOAA, [is] that government agencies should become, through the assessment of appropriate fees, "self sustaining *to the full extent possible.*" 31 U.S.C. § 483a (1970) (emphasis added). It is our interpretation of this mandate that the Commission should retain the maximum portion of the fees collected that would be permissible under the principles announced in *NCTA, New England Power,* and the statute.
>
> What proportion that is, we do not know; so we remand this case to the agency with instructions that it initiate proceedings to recalculate the 1970 fee schedule in accordance with the "value to recipient" standard laid down in *NCTA*
> . . . .
> Having calculated a proper fee under these guidelines, the Commission should refund that portion of the money which was collected in excess thereof.

*Id.* at 1133. The Board stresses that its "offsetting" refund procedure will not be used to obtain more money than carriers already have paid; it will be used only to limit the refunds. The Board therefore contends that its refund policy serves to "retain the maximum portion of the fees collected that would be permissible under the . . . [IOAA]." *Id.*

Contrary to the Board's contention, the refund procedure outlined in *National Ass'n of Broadcasters* differs significantly from the Board's procedure. In *National Ass'n of Broadcasters,* the agency was instructed to refund fees on an individual basis. *Id.* ("Having calculated a proper fee . . ., the Commission should refund that portion of the money which was collected in excess thereof."). By contrast, the Board's "offsetting" procedure refunds fees, if at all, only on a cumulative basis.

That these two procedures operate differently is demonstrated by the following example. Assume that a refund applicant paid two fees during the year, the first which was unlawfully high and the second which could lawfully have been higher. Under the procedure in *National Ass'n of Broadcasters,* the applicant would be entitled to a refund for having been overcharged on the first fee and would have no obligation to pay an additional amount for the second fee. Under the Board's "offsetting" procedure, however, if the overcharge on the first fee was less than the undercharge on the second fee, the applicant would receive nothing. The Board's procedure in effect retroactively raises the second fee and collects at least a portion of this retroactive increase by withholding the refund owed for the overcharge on the first fee.

This the Board cannot do. It is clear, in the above example, that if no issue were presented as to the first fee, the Board could not obtain more money by retroactively raising the second fee. *See National Ass'n of Broadcasters,* 554 F.2d at 1133 n. 42. *See generally Arizona Grocery Co. v. Atchison Ry.,* 284 U.S. 370, 389, 52 S.Ct. 183, 186, 76 L.Ed. 348 (1932). We hold that the Board may not reach the same result indirectly by nullifying and retaining a refund to which a carrier is entitled.[16]

---

**16.** The Board's "offsetting" procedure ignores the following crucial language in *National Ass'n of Broadcasters:*

> In [remanding this case], we are not asking the [agency] to engage in "retroactive rulemaking." The procedures on remand are intended to produce *no new rule which would impose new obligation* or involve additional parties; they will merely calculate the amount of refund which will effectuate the statutory intent of the IOAA.

554 F.2d at 1133 n. 42 (emphasis added) (citation omitted). The Board's "offsetting" procedure effectively imposes on air carriers obligations that did not exist when the fees originally were paid. Imposing such obligations is tantamount to retroactive rulemaking and is destructive of the carriers' justifiable reliance on the fee schedule as it previously read. *See New England Power Co. v. NRC,* 683 F.2d 12, 15 n. 4 (1st Cir.1982). *See also SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); *Retail, Wholesale and Dep't Store Union v. NLRB,* 466 F.2d 380, 389–90 (D.C.Cir. 1972).

Accordingly, we remand this case to the Board with instructions to modify its refund procedure for post-1977 fee assessments to eliminate the unlawful retroactive effect. The Board should retain the maximum portion of *each fee* collected that would be permissible under the IOAA. The Board may not, however, annul a specific overpayment by the cumulative "off-setting" approach.[17]

### III. CONCLUSION

For the foregoing reasons, we remand this case to the Board for proceedings consistent with this opinion.

*It is so ordered.*

[17.] We reject petitioner's argument for refunds of all fees collected since 1977 as irreconcilable with this court's decision in *National Ass'n of Broadcasters v. FCC,* 554 F.2d 1118 (D.C.Cir. 1976). We also find meritless petitioner's other procedural and substantive challenges to the Board's refund procedure.