169 F.3d 1
 335 U.S.App.D.C. 85
 AIR TRANSPORT ASSOCIATION OF AMERICA, Petitioner,
v.
FEDERAL AVIATION ADMINISTRATION, United States Department of
Transportation, and United States of America, Respondents.
Port Authority of New York and New Jersey, Intervenor.
 No. 98-1109.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 11, 1999.
Decided March 5, 1999.
 
 On Petition for Review of an Order of the Federal Aviation Administration.
 Campbell Killefer argued the cause for petitioner. With him on the briefs were Robert E. Cohn and David Berg.
 Jacob M. Lewis, Attorney, United States Department of Justice, argued the cause for respondents. With him on the brief were Frank W. Hunger, Assistant Attorney General, Barbara C. Biddle, and Howard S. Scher, Attorneys.
 Arthur P. Berg argued the cause for intervenor. With him on the brief was Carlene V. McIntyre.
 Scott P. Lewis, Kenneth W. Salinger, Thomas R. Devine, and Patricia A. Hahn were on the brief for amicus curiae Airports Council International-North America.
 Before: SILBERMAN, SENTELLE, and GARLAND, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 Petitioner, an association of air carriers, challenges the Federal Aviation Administration's partial approval of the Port Authority of New York and New Jersey's application to collect a passenger fee and to use the resulting revenue to construct a light rail system providing ground access to John F. Kennedy International Airport. We believe the FAA reasonably interpreted the statute governing this matter, except insofar as the FAA thought itself permitted to rely on material submitted ex parte by the Port Authority after the notice and comment period on the application had expired. Accordingly, we grant the petition for review.
 
 I.
 
 2
 Under a provision of the Federal Aviation Act, local public airport authorities may apply to the FAA for authority to impose a Passenger Facility Charge (PFC) of $1.00, $2.00, or $3.00 on each paying air passenger in order to finance an "eligible airport-related project," such as a project for airport development, airport planning, or terminal development. Each eligible airport-related project must serve one of three purposes: the one relevant here is to preserve or enhance capacity, safety or security of the national air transportation system.[1] After the airport authority submits its application to the FAA, the FAA must provide notice and an opportunity to air carriers and other interested persons to comment on the application. The FAA does so by publishing a notice in the Federal Register advising that it intends to rule on the application and inviting public comment, and by requiring the applicant to make available to the public, upon request, a copy of the application, notice, and other germane documents. Following review of the application and public comments, the FAA issues a final decision on the application; if the FAA finds, based on the application and public comments, that the proposed project serves one of the three enumerated purposes (such as enhancing capacity), that the amount and duration of the proposed fee will not result in revenue that is more than the amount necessary to finance the specific project, and that "adequate justification" has been shown for the project, the FAA may approve the application in whole or in part. See 49 U.S.C. § 40117 (1994); 14 C.F.R. §§ 158.27, 158.29 (1998).
 
 
 3
 The Port Authority filed an application requesting approval to collect a $3.00 PFC on passengers enplaning at LaGuardia, Newark International, and John F. Kennedy International airports and to use the $1.248 billion in resulting revenue to construct an 8.4 mile light rail system to connect the New York City Transit subway and the Long Island Railroad to JFK airport, apparently the largest single application ever submitted to the FAA. The proposed system consists of three interconnected components: a 3.3 mile railway from the Howard Beach subway station to JFK; a 3.1 mile elevated railway along the Van Wyck Expressway from the Jamaica Long Island Railroad Station and Sutphin Boulevard subway station to JFK; and a two-mile elevated rail loop in the airport's terminal area. Following the FAA's publication of notice in the Federal Register, petitioner filed comments opposing the application, contending that the project did not meet the statutory requirements described above. Petitioner argued, inter alia, that the Port Authority had not adequately justified the project's stated purpose of enhancing capacity at JFK. After the close of the 30-day comment period, and at the agency's request, the Port Authority provided additional information to the FAA on the project's forecasted effectiveness in enhancing capacity. This additional information was not disclosed to the petitioner or to any other interested party. Shortly thereafter, the FAA issued its decision, in which it partially approved the collection and use of PFC revenue to finance the light rail system.
 
 
 4
 The FAA found "adequate justification" for the project because it would enhance capacity at JFK. Although it viewed the Port Authority's original application--which claimed that the project would divert 134,000 air passengers annually from LaGuardia and Newark to JFK by the year 2003--as insufficient to justify the $1.248 billion expenditure, the FAA was persuaded by the supplemental information provided to it ex parte by the Port Authority after the close of the comment period. In that supplemental material, the Port Authority calculated that road access to JFK would reach its limiting capacity by the year 2003, at which time it could accommodate 36 million potential air passengers annually. The airport itself, however, would be able to handle far more passengers--not reaching its capacity of 45 million passengers until 2013. The Authority projected that this gap between landside capacity and airside capacity could be reduced by the construction of the light rail system; it estimated that the project would enable an additional 3.35 million annual air passengers to get to JFK airport in 2013 than would otherwise be able to without the rail system. The FAA found this to be an adequate justification for the project.
 
 
 5
 The FAA also explained that it was approving the project only in part because it had identified certain costs--such as maintenance and storage facilities and any equipment needed for fare collection--that would be ineligible for PFC revenue. As the precise amount of ineligible costs could not be determined from the generalized plans submitted at this preliminary stage, the FAA approved the total cost of the project under condition that the Port Authority submit adequate detailed design and cost information to the FAA after design is complete and before construction is begun to enable a determination of ineligible costs. The Port Authority was also required to amend its application immediately to decrease the amount of requested revenue to account for any ineligible costs identified by the FAA in the future.
 
 
 6
 Petitioner also had argued in its comments that the Jamaica component was not an eligible airport-related project because it would not be part of the "airport" as defined in 49 U.S.C. §§ 40117(a)(1) and 47102(2), but would instead consist of a right-of-way along the Van Wyck Expressway. The FAA explained, however, that airport-owned rights-of-way are within the boundaries of the airport, and therefore, when the Port Authority acquires the necessary rights-of-way, the Jamaica component will be an eligible airport facility. This petition followed.
 
 II.
 
 7
 Petitioner raises two substantive statutory challenges--that the FAA's decision was ultra vires because the agency lacked authority to grant a conditional approval, and that the agency's decision permitted financing of illegal off-airport improvements. It is also argued that the agency solicited and accepted from the Port Authority--ex parte--critical, even decisive information, thus illegally circumventing the statute's notice and comment requirements. And if that were not enough, petitioner also claims that the FAA's decision was arbitrary and capricious. We take up the challenges in that order.
 
 
 8
 It is undisputed that certain of the project's design elements are not eligible for PFC funding. Petitioner claims that because the FAA approved the project, without specifying at the time of the approval the exact amount of the proposed expenditures that will be disallowed, the statute is violated. The FAA explained in its decision, and reiterates before us, that at this stage it is not clear just how much of the total expenditures would be attributed to these ineligible categories. Petitioner relies on 49 U.S.C. § 40117(b)(1), which restricts PFC funds to "eligible airport-related projects," and 49 U.S.C. § 40117(d)(1), which allows the FAA to approve an airport's request "only if the [FAA] finds, based on the application, that the proposed passenger facility fee will result in revenue ... that is not more than the amount necessary to finance the specific project" (emphasis added). Petitioner accordingly argues that the FAA must definitively prune any unauthorized expenditures at the time of its approval based on information provided in the application, not in a subsequent decision based on further information.
 
 
 9
 Although the inference petitioner would draw as to the statute's meaning is not by any means unreasonable, it is also not inevitable. The language does not preclude the FAA's interpretation--that the "finding" can be a conceptual one, subject to subsequent proceedings to insure that the actual costs are consistent with the conceptual boundaries. The statute thus must be thought silent or ambiguous on the precise issue before us, and we are obliged under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to defer to the agency's interpretation if it is a permissible one. We see nothing in the language, structure or legislative history to suggest that it fails that test. Nor are the FAA's regulations inconsistent with the decision; they authorize an airport agency "to apply for authority to impose a PFC in advance of or concurrent with an application to use PFC revenue," 14 C.F.R. § 158.25(a) (emphasis added), provided that if the application to impose is made in advance of the application to use, the applicant must include, inter alia, a "description of alternative uses of the PFC revenue to ensure such revenue will be used only on eligible projects in the event the proposed project is not [ultimately] approved," id. at § 158.25(b)(14)(ii). When the applicant is ready to use the PFC funds, he must again obtain FAA approval. Id. at § 158.25(c)(2); see Northwest Airlines, Inc. v. FAA, 14 F.3d 64, 71 (D.C.Cir.1994). The FAA is consistent, therefore, in concluding that a concurrent application for collection and use, such as the one at issue here, may also be approved subject to future assurance that any ineligible elements will not be funded. When the design is complete, the Port Authority must submit its amended application for FAA approval as noted in the FAA's decision. And the statute, see 49 U.S.C. § 40117(h)(2), and regulations, see 14 C.F.R. §§ 158.25(c)(2)(i); 158.27, indicate that this revision process would include additional consultation with the airlines and a new round of notice and comment. In sum, the FAA's interpretation passes muster.
 
 
 10
 Petitioner next contends that the FAA exceeded its statutory authority in approving the project because the Jamaica component of the project does not qualify as an "airport" facility. Section 47102(2)(A) defines airport as
 
 
 11
 (i) an area of land or water used or intended to be used for the landing or taking off of aircraft;
 
 
 12
 (ii) an appurtenant area used or intended to be used for airport buildings or other airport facilities or rights of way; and
 
 
 13
 (iii) airport buildings and facilities located in any of those areas.
 
 
 14
 49 U.S.C. § 47102(2)(A) (emphasis added).[2] Petitioner argues that because the Port Authority does not currently own the necessary rights-of-way to construct the Jamaica component, that component cannot be thought part of the "airport." The FAA acknowledged that the Port Authority does not yet own those rights-of-way, but believed that for the purposes of approving the application, the Port Authority's certification that it would take ownership before use of PFC funds on that component is adequate. Again the statute is silent as to whether the airport authority must also own the rights-of-way prior to the approval of the application. As with the FAA's decision to approve the application subject to amended cost data, we think it is a permissible interpretation under Chevron for the FAA to approve the application on the assurance that the necessary rights-of-way will be acquired. Indeed, it would be unreasonable, because likely unworkable, to require airport authorities to expend large sums of money to acquire tracts of land before a project was even partially approved.
 
 
 15
 Alternatively, petitioner contends that even if the Port Authority did own the rights-of-way now, the Jamaica component would still not meet the eligibility requirements. Petitioner's reading of the statute is that "rights of way" is one type of "an appurtenant area," 49 U.S.C. § 47102(2)(A)(ii), which in turn modifies "an area ... used or intended to be used for the landing or taking off of aircraft," id. at § 47102(2)(A)(i), meaning that for a right-of-way to be "on-airport," it must be attached to the landing area along its entire length. As the Jamaica component of the light rail system would only be attached to JFK airport at its terminus, petitioner argues that this component does not fall within the meaning of "airport." Petitioner would support its interpretation by pointing to another part of the statute which notes that terminal development costs are allowable for "moving passengers ... within the airport," id. at § 47110(d)(1)(B) (1994); see also id. at § 40117(a)(3)(B), from which petitioner concludes that the entire right-of-way must be within the airport. The FAA, on the other hand, not surprisingly reads the statute as requiring only that the right-of-way be attached to the airport landing area at some point, but not necessarily along the entire length of the right-of-way. The FAA responds to petitioner's emphasis on the words "within the airport," id. § 47110(d)(1)(B), by pointing out that once the Port Authority owns the right-of-way, that strip of land is by definition airport-owned and therefore "within the airport." This interpretation is at least reasonable, and it is consistent with the FAA's own regulations and past practice. See, e.g., 56 Fed.Reg. 24,254, 24,258 (1991) (preamble to current regulations, noting that "ground transportation projects are eligible if the public agency acquires the right-of-way"); Applications to Use Passenger Facility Charge Revenue, No. 98-03-U-00-EWR, et al., at 7 (November 6, 1996) (FAA approval for use of PFC funds to construct a transit link between an AMTRAK rail station and the Newark International Airport monorail on to-be-acquired rights-of-way).
 
 
 16
 Petitioner's citation to legislative history indicating that "off-airport" uses of PFC revenue are prohibited begs the question. The FAA has simply said that airport-owned rights-of-way are not off-airport because they are within the boundaries of the airport. Petitioner's reliance on the FAA's interpretive guidelines for evaluating PFC-eligible projects, moreover, is quite unpersuasive. Petitioner points to the FAA's Airport Improvement Program Handbook[3] describing the eligibility criteria for "rapid transit facilities" and "access roads" differently. It states that rapid transit facilities "located within the airport boundary that are necessary to provide a connection to a rapid transit system may be eligible if they will primarily serve the airport," Airport Improvement Program Handbook, FAA Order 5100.38A, at p 555 (Oct. 24, 1989) (emphasis added), whereas access roads "must be located on the airport or within a right-of-way acquired by the airport," id. at p 553(a)(2) (emphasis added). Petitioner thus claims that rapid transit facilities using PFC funds such as this light rail system cannot be constructed on rights-of-way. But there is nothing in the Handbook or the statute or regulations that indicates that airport-owned rights-of-way are outside the "airport boundary," and the FAA is reasonable in construing its own interpretive guidelines to mean that rights-of-way are within the airport boundary. See Paralyzed Veterans of Am. v. D.C. Arena L.P., 117 F.3d 579, 584 (D.C.Cir.1997) (citing Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997)), cert. denied sub nom. Pollin v. Paralyzed Veterans of Am., --- U.S. ----, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998).
 
 III.
 
 17
 Petitioner's procedural argument fares better. The statute requires the FAA to "provide notice and an opportunity to air carriers ... and other interested persons to comment on the application." 49 U.S.C. § 40117(c)(3). This provision is similar to the notice and comment procedure for informal rulemaking under the Administrative Procedure Act, 5 U.S.C. § 553 (1994). Here the airport's application is analogous to a notice of proposed rulemaking.[4] In the rulemaking context, an agency's notice must "fairly apprise interested persons of the 'subjects and issues' " involved in the rulemaking, Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 547 (D.C.Cir.1983) (quoting American Iron & Steel Inst. v. EPA, 568 F.2d 284, 293 (3d Cir.1977)), but even if the final rule deviates from the proposed rule, "[s]o long as the final rule promulgated by the agency is a 'logical outgrowth' of the proposed rule[,] ... 'the purposes of notice and comment have been adequately served' [and] we will find no procedural violation," Appalachian Power Co. v. EPA, 135 F.3d 791, 804 n. 22 (D.C.Cir.1998) (quoting Fertilizer Inst. v. EPA, 935 F.2d 1303, 1311 (D.C.Cir.1991)); see also National Black Media Coalition v. FCC, 791 F.2d 1016, 1022 (2d Cir.1986).
 
 
 18
 The government argues that the supplementary information which the Port Authority provided similarly merely clarified and expanded upon information in the application. After all, an agency itself can rely on such supplemental data not disclosed in a proposed rule. See Solite Corp. v. EPA, 952 F.2d 473, 485 (D.C.Cir.1991) (no procedural error where agency used supplementary data, not disclosed during the notice and comment period, which expanded on and confirmed information in the proposed rulemaking); Air Transp. Ass'n of Am. v. CAB, 732 F.2d 219, 224 (D.C.Cir.1984) (no procedural error where agency relied on internal staff studies, not disclosed during the notice and comment period, where the methodology was disclosed and no major changes in the final rule occurred). As has been often observed, an agency engaged in informal rulemaking is not obliged to consider only record evidence, see, e.g., Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 547-48, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System, 745 F.2d 677, 684-85 (D.C.Cir.1984). But even in the informal rulemaking context, we have cautioned that the most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation. Association of Data Processing Serv. Orgs., 745 F.2d at 677 (emphasis added). Still, the focus in our rulemaking cases is primarily on whether the final rule changes critically from the proposed rule rather than on whether the agency relies on supporting material not published for comment.[5] The question is typically whether the agency's final rule so departs from its proposed rule as to constitute more surprise than notice. See Air Transp. Ass'n of Am., 732 F.2d at 225 n. 12.
 
 
 19
 Here, the application itself--including the submitted justification--is the analogy to the proposed rule. See 14 C.F.R. § 158.25(b)(7) (requiring the application to include justification for the project). So, the question in this case is whether the supplemental material provided by the Port Authority ex parte as justification for its application critically deviated from the justification presented in the application itself. There seems little doubt that the answer is yes because the FAA itself said so; its own decision explained that but for the new information it would have rejected the application:
 
 
 20
 In examining the Port Authority's application, the FAA was concerned that the addition of 134,000 annual air passengers ... in 2003 ... was not a sufficient basis for an informed judgment that the $1.5 billion [light rail system] project was adequately justified on the basis of this measured effect on airport capacity or competition. No other measured effect on airport capacity or competition was provided in the PFC application as submitted.[6]
 
 
 21
 Recall that the Port Authority's original application set forth as the benefit of the expenditure an increase of JFK air passengers of only 134,000 annually by 2003. And that was a measure of how many passengers would be diverted from the two other airports operated by the Port Authority. The supplemental information--that a 3.35 million air passenger capacity increase would be obtainable at JFK by 2013--is an order of magnitude greater, and is a measure of something entirely different--the light rail system's ability to increase capacity at JFK (and possibly increase net capacity of all three airports) by closing the gap between airside capacity and landside capacity at JFK. The important point is that because the transmission of this information--in effect a fundamental amendment of the application--was never public, petitioner did not have a fair opportunity to comment on it. See Independent U.S. Tanker Owners Comm. v. Lewis, 690 F.2d 908, 926 (D.C.Cir.1982) ("[W]here an agency's analytic task begins rather than ends with a set of forecasts, sound practice would seem to dictate disclosure of those forecasts so that interested parties can comment upon the conclusions properly to be drawn from them.").
 
 
 22
 Still, the FAA argues that any procedural error stemming from its failure to provide adequate notice and an opportunity to comment was harmless. See 5 U.S.C. § 706 (1994). The FAA claims that petitioner was not prejudiced by the lack of notice because petitioner did not rebut the Port Authority's supplemental information. It is true that to show prejudice, a "petitioner objecting to the ... late submission of documents must indicate with 'reasonable specificity' what portions of the documents it objects to and how it might have responded if given the opportunity," Air Transport Association v. CAB, 732 F.2d 219, 224 n. 11 (D.C.Cir.1984) (quoting Small Refiner, 705 F.2d at 540-41 (in turn quoting 42 U.S.C. § 7607(d)(7)(B))). But here petitioner had no knowledge of the new information until the final decision was made and had no subsequent opportunity to provide comments.[7] Compare National Ass'n of Regulatory Utility Comm'rs v. FCC, 737 F.2d 1095, 1121 (D.C.Cir.1984) (agency's failure to release staff study in time for comments during an initial comment period rendered harmless where agency subsequently allowed interested parties ample opportunity to comment and where agency addressed those comments in a reconsideration decision). Petitioner's reply brief does include the nature of its objection to the Port Authority's supplemental information, and it seems rather specific to us.
 
 
 23
 * * * *
 
 
 24
 As noted, petitioner also challenges the agency's decision as arbitrary and capricious. See 5 U.S.C. § 706(2)(A). Petitioner claims that the forecasted benefits are based on erroneous assumptions; petitioner submits, for example, that the real constraints on JFK's capacity derive not from limited ground access, but rather from airline "slot" limitations. In other words, air capacity limitations will be reached long prior to any ground capacity constraints. We think it appropriate, in light of the necessity to remand this proceeding to allow the airlines adequate opportunity to comment on the application, that we not decide this issue on the artificially restricted record before us. By the same token, we defer dealing with petitioner's claims that the FAA did not adequately weigh the costs of this project against the benefits. We do think it appropriate now to definitively reject petitioner's assertion that any such process is governed by Executive Order No. 12,893, 59 Fed.Reg. 4233 (1994), which requires a "systematic analysis of expected benefits and costs," id. § 2(a), for infrastructure investments of federal agencies. Section 7 of the Order (not reproduced in petitioner's brief) provides that it is "intended only to improve the internal management of the executive branch and does not create any right ... enforceable against the United States." As such, this Executive Order is not subject to judicial review. See Meyer v. Bush, 981 F.2d 1288, 1296 n. 8 (D.C.Cir.1993) (citing cases). Although petitioner indicated that it does not seek to assert rights under the order but is merely referencing it to provide evidence of the arbitrary and capricious nature of the FAA's decision, such an argument is nothing more than an indirect--and impermissible--attempt to enforce private rights under the order.
 
 
 25
 Petitioner also claims to find support for its argument that the FAA must conduct a cost/benefit analysis from an interim FAA policy guidance that requires cost/benefit analysis for certain grants under the Airport Improvement Program (AIP). See 62 Fed.Reg. 34,108, 34,109 (June 24, 1997). Petitioner thinks that the PFC statute "incorporates" the AIP statute, 49 U.S.C. §§ 47101-47131, so PFC funds should be treated like AIP funds. To be sure, the PFC statute defines "eligible airport-related project" as, inter alia, a project "for airport development or airport planning under subchapter I of Chapter 471 of this title [Airport Improvement Program Statute]," which means that PFC funded projects must meet the same definition for "airport development or airport planning" as do projects funded by AIP monies, see 49 U.S.C. § 47102(3), (5). But it is only those definitions that are incorporated from the AIP statute into the PFC statute, not the provision of the AIP statute setting forth the standards for approval of an AIP discretionary fund project (or any other provision of the AIP statute for that matter). The interim policy guidance mandating cost/benefit analysis for AIP projects specifically cites that discretionary fund provision as its authorizing statute, see 62 Fed.Reg. at 34109, and so it is clear that this interim policy guidance has no bearing on the PFC statute.
 
 
 26
 * * * *
 
 
 27
 Accordingly, we grant the petition for review, vacate the FAA's decision, and remand the case to the FAA for further proceedings not inconsistent with this opinion.
 
 
 28
 So ordered.
 
 
 
 [1]
 Before submitting an application to the FAA, the airport authority must provide notice to, and an opportunity for consultation with, air carriers operating at the airport
 
 
 [2]
 The statutory provision governing PFCs, 49 U.S.C. § 40117(a)(1), defines "airport" by reference to the definition of "airport" found in 49 U.S.C. § 47102. The parties appear to assume that an eligible airport-related project must be on the "airport" as defined under § 47102
 
 
 [3]
 The type of "eligible airport-related project" at issue here, for airport development, is defined by reference to 49 U.S.C. § 47102(3), a provision of the Airport Improvement Program statute. See 49 U.S.C. § 40117(a)(3)(A)
 
 
 [4]
 Whereas the APA requires that a notice of proposed rulemaking be published in the Federal Register, 5 U.S.C. § 553(b), the PFC statute does not mandate a specific sort of notice or publication. The FAA's regulations provide for publication in the Federal Register of a notice of a pending application, which includes a summary description of the application, see 14 C.F.R. § 158.27(c)(2), (e)(2), and require the applicant to make the application available, upon request, to the public for inspection, see id. § 158.27(c)(3)(i)
 
 
 [5]
 Petitioner suggests that the Port Authority's ex parte contacts with the FAA per se rendered the decision unlawful. Although we once held that an agency's receipt of ex parte information in an informal rulemaking is itself a violation of law, see Home Box Office, Inc. v. FCC, 567 F.2d 9, 57-58 (D.C.Cir.1977), we have since interpreted Home Box Office as applying only in the APA informal rulemaking context, see Elcon Enterprises, Inc. v. Washington Metropolitan Area Transit Authority, 977 F.2d 1472, 1481 (D.C.Cir.1992); but see United States Lines, Inc. v. FMC, 584 F.2d 519, 539-40 (D.C.Cir.1978) (applying the reasoning of Home Box Office in a quasi-adjudicatory proceeding). Home Box Office, which was sharply limited by Sierra Club v. Costle, 657 F.2d 298, 401-02 (D.C.Cir.1981), could be thought to be undermined by Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 546, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). If ex parte material were to lead to an unanticipatable change in the final rule, that would be, of course, objectionable
 
 
 [6]
 Applications to Impose a Passenger Facility Charge, No. 97-04-C-00-EWR, et al. at 22 (Feb. 9, 1998)
 
 
 [7]
 The FAA counters that petitioner could have sought reconsideration to rebut the FAA's conclusions. But the regulations relevant here make no provision for reconsideration. Cf. Darby v. Cisneros, 509 U.S. 137, 146, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)